Steven AVILEZ, Appellant,

v.

The STATE of Texas, Appellee.

Nos. 01–07–00591–CR, 01–07–00592–CR.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 7, 2010.

Concurring Opinion Oct. 12, 2010.

Discretionary Review Refused March 9, 2011.

Mark Hochglaube, Steven Avilez, Houston, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, Jessica A. Mc-Donald, Assistant District Attorney, Houston, TX, William J. Delmore III, Assistant District Attorney, Conroe, TX, for Appellee.

Panel consists of Justices KEYES, SHARP, and MASSENGALE.

## OPINION

MICHAEL MASSENGALE, Justice.

A jury convicted appellant Steven Avilez of stalking (trial court case number 1119152; appellate court case number 01–07–00592–CR) and violation of a protective order (trial court case number 1119154; appellate court case number 01–07–00591–CR). *See* TEX. PENAL CODE ANN. §§ 25.07, 42.072 (Vernon 2003 & Supp.2010). The jury sentenced him to prison for three years on each count, with the sentences to run concurrently.

Avilez brings two issues on appeal. He contends that his convictions violate the Double Jeopardy clauses of the Texas and United States Constitutions, but we overrule this issue because the offenses of stalking and violating a protective order each contain unique elements that are not required for conviction of the other offense. Avilez also contends that he is entitled to a new trial because the trial court was biased against him. We decline to reverse on that ground because his complaints relate to the trial court's exercise of discretion in regulating the conduct of the trial, and he does not allege fundamental trial error implicating constitutional guarantees of due process. Accordingly, we affirm.

## FACTUAL BACKGROUND

Complainant Amanda Bucklin dated and lived with appellant Steven Avilez for approximately 18 months. She testified that he became physically and emotionally abusive, and she ended the relationship. Avilez was subsequently charged with and

pleaded guilty to stalking, and a trial court placed him on deferred adjudication. The conditions of his community supervision required that he have no contact with Amanda.

Amanda testified that for a period of time after her relationship with Avilez ended, she abused alcohol and drugs. On occasion she called him and initiated sexual activity. Eventually she obtained a protective order against Avilez. Later she married Zach Bucklin. According to Zach's and Amanda's testimony, Avilez began to initiate contact with them a month after their daughter was born. He called them, called their friends and inquired about them, drove past their home, and followed them. They testified that this behavior occurred repeatedly over the course of eight months.

In addition, Amanda testified that she resumed abusing alcohol and spent approximately two months in a rehabilitation facility with her infant daughter. On one occasion, she saw Avilez outside the building looking in. Later, he mentioned to her certain details that he could know only if he had been there, such as the kind of baby carriage she used. Amanda denied initiating any contact with Avilez during this time, except a single phone call that she placed at the request of a police investigator who was trying to apprehend him. She obtained a second protective order, and ultimately Avilez was charged with and convicted of violation of a protective order and stalking.

## PROCEDURAL BACKGROUND

Avilez contends that his trial was unfair because the judge was biased against him.

Accordingly, we describe in detail the relevant trial proceedings and the trial judge's conduct that has been challenged on appeal.

Over the course of two days of trial testimony, the court permitted the parties to develop the aforementioned background information about the history of Avilez's relationship with Amanda, but the trial court repeatedly attempted to narrow the focus of the trial to the specific time period and actions directly relevant to the then-pending charges against Avilez. The trial court admonished many witnesses, including both Amanda and Avilez, to limit their answers to "yes or no" if the question required no more. The trial court also sustained numerous objections that a witness was giving a nonresponsive answer.

The State called nine witnesses, two of whom were the State's primary witnesses, Amanda and Zach Bucklin. Avilez's trial counsel objected seven times during Amanda's initial direct examination, and the trial court sustained four of those objections. Near the end of Amanda's direct testimony, defense counsel objected for the first time that she was testifying in the form of a narrative, and the trial court instructed the prosecutor to limit the testimony to the form of questions and answers. Then, before Amanda's cross-examination, the trial court addressed the attorneys outside the presence of the jury. He advised them that he would allow Avilez's attorney to inquire generally into the continuing relationship that Amanda had with Avilez to the extent it was relevant to rebut an element of a charged offense.[1]

---

1. Among other elements of the offense, to be convicted of stalking, a defendant must be shown to have knowingly engaged in specified behavior that he knew or reasonably believed the other person would regard as threatening. TEX. PENAL CODE ANN. § 42.072(a)(1). We infer that the issue being discussed by the court

and counsel was the extent to which Avilez would be permitted to present evidence about the nature of his continuing contacts or relationship with Amanda so as to rebut the allegation that he knew or reasonably believed

However, the trial court also made clear his intention to avoid unnecessary sordid detail.

> TRIAL COURT: But the bottom line is, you [the State] did go into their background very extensively. I will let you [defense counsel] explore that to some degree. There is some probative value, I guess, to that; but not to the point where I'll allow you to go into the details of this or that or the other. I wouldn't let the State—
>
> . . .
>
> [S]o if the situation's where it looks like it's going beyond what I've tried to sort of outline, certainly, you're welcome to make a record or make a bill, whatever you want if you think I'm out of line. But I'm trying to keep it within those parameters. I want just relevant testimony, and if it's relevant to the elements of the offense, then that's one thing. But we don't need to go into, again, into the sor[did] details of someone's physical relationship, that's the best way I can put it.
>
> . . .
>
> DEFENSE COUNSEL: I think we're already there. I mean, before we ever picked a jury I figured it was going to be a free-for-all.
>
> TRIAL COURT: Well, it is not going to be a free-for-all.
>
> DEFENSE COUNSEL: As far as relevance is concerned.
>
> TRIAL COURT: Well, that was a very, very severe miscalculation on your part because it is not going to be a free-for-all. And this is basically looking at whether or not during this period of time this Defendant engaged in the stalking of this complainant and whether or not he violated a protective order during that period of time.

> Now, as I have said, and I believe the State did as general a broad brush stroke as they could to establish the relationship in the past. But I am not going to let something come in that then opens the door to something else and then we're here trying a divorce case. I don't do those. I will not do those. I am praying to God I never have to do one of those. That's just where we're going to be.
>
> If you want to establish that she initiated contact with him and so forth, that's fine. If you want to say they engaged in a physical relationship, that's fine. But that's as far as I'm willing to go.

During cross-examination, Avilez's attorney instructed Amanda to answer his question, and the trial court told him, "Just object and I'll give the instruction." When Amanda later gave a nonresponsive answer, the trial court sua sponte instructed her, "If the question calls for a yes or no answer, just answer yes or no. If you can't answer yes or no, just say I can't answer it that way.... But please, just answer the questions that are asked and the lawyers will ask other questions. We all have to go by this rule." The trial court sustained three defense objections that Amanda's answer was nonresponsive and admonished Amanda at least four times that she should answer only "yes" or "no" if the question called for a "yes" or "no" answer.

During Zach's direct testimony, Avilez objected three times to hearsay and once to a leading question. Avilez did not object that Zach was testifying in the form of a narrative. During cross-examination, Avilez objected that one answer was nonresponsive. The trial court sustained the objection and admonished Zach, "Just listen carefully to the question. If you can't answer 'yes' or 'no,' if it's a 'yes' or 'no'

that Amanda would regard his conduct as threatening.

question, if you can't answer it 'yes' or 'no' you may say that. If you don't understand the question, you may say as well. Just try to focus on the questions the lawyers are asking and just answer those."

In his defense case, Avilez called his sister and mother to testify, and then he testified in his own defense. During his sister's direct testimony, the trial court again admonished defense counsel at the bench to narrow the questioning to the relevant time period. During the direct testimony of Avilez's mother, the trial court sua sponte admonished her once that a question called for a "yes" or "no" answer. During her cross-examination, the trial court admonished her, "Ma'am, if it calls for a 'yes' or 'no' answer, please just answer 'yes' or 'no.' It just takes up so much more time. I promise, these lawyers are very capable of asking you all the questions that they want answered. So, if it calls for a 'yes' or 'no,' just answer, just answer 'yes' or 'no.' Thank you." Twice, the trial court sua sponte advised her to answer only "yes" or "no" to questions calling for "yes" or "no" answers. On two other occasions, the trial court asked her to speak up or speak into the microphone.

When Avilez himself took the stand, the trial court repeatedly admonished him to confine his answer to the question asked, including admonishments outside the presence of the jury. At the beginning of Avilez's testimony, his attorney asked him where he grew up, and he responded, "I lived basically all my life in Pasadena, but I have lived around different places. I used to live——." The trial court interrupted him and instructed him to answer the question. His attorney then asked him if he graduated from high school, and Avilez responded, "With honors, sir." The trial court immediately removed the jury to admonish Avilez.

TRIAL COURT: On the record. Mr. Avilez, you've been sitting in this court-room throughout this trial, and it's obvious to me that you have to have heard the admonishments that I've given the other witnesses. I've sent the jury out because I don't want to admonish you in front of them, but I'm going to admonish you nonetheless. When these lawyers ask a question, you answer only their question. If it calls for a yes or no answer, you answer them yes or no; do you understand?

AVILEZ: Yes, Your Honor.

TRIAL COURT: Good. I don't want to have to do this again. It's a waste of time, but I will. You understand?

AVILEZ: Yes, Your Honor.

The jury returned, and soon thereafter Avilez's attorney asked him about a job he held after college, "What were you doing at NASA?" Avilez responded, "I worked in the labs. We used to get——", and the trial court admonished him, "Sir, just answer the questions." Shortly thereafter, Avilez's attorney asked him, "What—did you actually work for the National—NASA? I can't remember the acronym. National Aeronautic—whatever it is. Anyway, or did you work for a subcontractor?" and he responded, "Actually, the name of the subcontractor is United States Space Alliance. It's the major subcontractor." The trial court again removed the jury to admonish Avilez again.

TRIAL COURT: On the record. You've been on the stand for approximately 10 minutes, and this is the second time that I've sent the jury out to admonish you. Since you are a graduate with honors apparently from high school, you probably understand this. You answer the question that's asked. You understand?

AVILEZ: Yes, sir.

TRIAL COURT: You do it again, I'm going to hold you in contempt. You understand that?

AVILEZ: Yes, sir, Your Honor.

TRIAL COURT: You know what that means?

AVILEZ: I've heard the phrase, but not exactly.

TRIAL COURT: It means six months in jail each time you do it, and I can stack them up to 18 months. Do you understand that?

AVILEZ: Yes, sir.

TRIAL COURT: Does that register with you?

AVILEZ: Yes, Your Honor.

TRIAL COURT: And if you want to talk to him for a minute, [trial counsel], please do. But we're not going to have a 12-minute answer to every simple question that you're asking. You're trying everything that you can, I understand, to make these questions simple. I'm making these admonishments very simple. Don't do it again.

AVILEZ: May I speak to my Counsel for a minute, sir?

TRIAL COURT: No, sir, not unless he comes up here.

TRIAL COUNSEL: Could we have a couple seconds, Your Honor?

TRIAL COURT: Yes.

. . .

TRIAL COURT: Let's go. Mr. Avilez, are we clear on this?

AVILEZ: Yes, sir. With all due respect, I'm just trying to gather my thoughts. I apologize.

TRIAL COURT: I believe you're trying to answer questions that have not been asked. That's the reason I sent the jury out with all due respect. So, you have sat and watched this entire trial, and you're the only witness in this entire trial, besides your mother, who has had a little trouble with that, but you seem to have a tremendous amount of trouble with it. So, you need to understand, everybody goes by this rule. Everybody that testifies, whether it is some- one who is a witness, someone who is charged with a crime, I will give them the same level of respect, the same level of decorum in dealing with them, that they will follow the same rules. Do you understand that?

AVILEZ: Yes, Your Honor.

TRIAL COURT: If you do it again, I'm going to hold you in contempt. So, don't be surprised. Okay?

The jury returned, and direct examina- tion continued. Prior to holding Avilez in contempt, the trial court stated three times "calls for a yes or no answer" when Avilez offered additional information, sus- tained six objections that Avilez's answer was nonresponsive to his counsel's ques- tion, and twice admonished Avilez's trial counsel at the bench.

TRIAL COURT: I'm not doing a di- vorce. . . . We're getting way too broad on this. The only question to be an- swered in this trial is whether or not he violated a protective order and/or stalked this woman. And the definition of the term, between the dates of April 4th, 2006, through November 16th, 2006, and that's it.

. . .

I'm about to hold him in contempt. I don't know how I can be any clearer to him. I know you've been clear to him. He's volunteering an answer every time you ask him something. I'm glad you're leading because you're trying as hard as you can to keep things in the middle of the road, but he is absolutely resistant to that. I told him if he does it again, I'm going to hold him in contempt. If he does it again, I'm going to. . . . I'm telling you this so you won't be sur- prised. You're probably surprised I ha- ven't already done it. . . . That's it. He can hear me. I guarantee you he's lis- tening.

The trial court held Avilez in contempt after the following testimony. Avilez had

testified that Amanda had continued to initiate contact during the relevant time period and that she had invited him to meet her at a convenience store to retrieve some personal items.

Q. Did you have reason to believe that these items were ever at that location?

A. Oh, yes, sir.

Q. And when you got over there, what did you find?

A. I was—nothing. I was walking down the street and then just out of nowhere somebody comes behind me and says, hey, you f—ing p—y. And I turned around and it's Zach and another gentleman.

The trial court immediately instructed the bailiff, "Take the jury out." Then the trial court noted that this was the third time he had removed the jury, and he held Avilez in contempt.

The second instance of contempt occurred after the following question.

Q. During this time period between April 4th, 2006, and November 16, 2006, did—do you think she was scared of you?

A. She told me she wasn't.

The trial court again removed the jury and sentenced Avilez to another six months, saying,

These are very simple rules, Mr. Avilez; and it is obvious to me that you are intentionally violating them and you are causing a great deal of delay in this trial. You're causing these lawyers to have to do twice as much work as they should have to get the same amount of information in front of the jury. So, I'm a man of my word. That will be six more months. And if you volunteer information again when it calls for a yes or no answer, I'll do the same thing again. It's very simple and I have no doubt that you understand it. But you're defying this Court, and I don't understand why. I have no other course to take but to hold you in contempt and give you another six months.

The jury convicted Avilez of both stalking (trial court case number 1119152; appellate case number 01–07–00591–CR) and violation of a protective order (trial court case number 1119154; appellate case number 01–07–00592–CR). It sentenced Avilez to confinement for three years in prison on each count, to run concurrently. On appeal, Avilez contends that (1) his convictions amount to double jeopardy because he was punished twice for the same conduct and (2) he was deprived of due process because the trial court was biased against him.

## DOUBLE JEOPARDY

In his first issue, Avilez argues that his convictions violate the Double Jeopardy clauses of the Texas and United States Constitutions because, as alleged in the indictments, stalking is a lesser-included offense of violation of a protective order.[2] The Fifth Amendment to the United States Constitution states: "No person . . . shall . . . be subject for the same offense to be twice put in jeopardy of life or limb."[3] The Double Jeopardy Clause protects an

2. Avilez acknowledges that he is raising this issue for the first time on appeal. A defendant may raise double jeopardy for the first time on appeal "when the undisputed facts show the double jeopardy violation is clearly apparent on the face of the record and when enforcement of usual rules of procedural default serves no legitimate state interests." *Gonzalez v. State*, 8 S.W.3d 640, 643 (Tex. Crim.App.2000). Thus, we will determine if the appellate record clearly shows a double jeopardy violation. *See id.* at 643–45.

3. U.S. CONST. amend. V. The Double Jeopardy Clause applies to the states through the Fourteenth Amendment. *Littrell v. State,* 271 S.W.3d 273, 275 (Tex.Crim.App.2008) (citing *Brown v. Ohio,* 432 U.S. 161, 164, 97 S.Ct.

accused from being punished more than once for the same offense.[4] When multiple punishments stem from a single prosecution, the offenses may be the same if one is a lesser-included offense of the other or if the two offenses are defined under distinct statutory provisions but the legislature has made it clear that only one punishment is intended.[5] Whether two offenses are the same is a matter of legislative intent.[6]

Such legislative intent is ordinarily determined by applying the "same-elements" test of *Blockburger v. United States.*[7] "To determine whether jeopardy attaches, a court must inquire whether each offense contains an element not contained in the other."[8] If not, they are the same offense and double jeopardy bars multiple punishments.[9] "In a multiple punishments case, an appellate court should focus on the statutory elements of the offenses ... since the paramount consideration in multiple punishment claims is whether the legislature intended to permit such punishments."[10]

In this case, Avilez was convicted of violation of a protective order and stalking. A conviction for violation of a protective order requires proof of a protective order issued under Chapter 85 of the Family Code and proof that the defendant (1) one time, (2) intentionally or knowingly violated that order, (3) by committing family violence or another specified action, by communicating with or threatening a protected person, or by going to or near the home or workplace of a protected person. TEX. PENAL CODE ANN. § 25.07. A conviction for stalking requires proof that the defendant (1) on more than one occasion and pursuant to the same scheme or course of conduct directed at another person, (2) knowingly, (3) engaged in behavior that (a) he knows or reasonably believes the other person will regard as threatening, (b) caused the other person or a member of the other person's family or household to fear bodily injury, death, or that an offense will be committed against that person's property, and (c) would cause a reasonable

2221, 2225, 53 L.Ed.2d 187 (1977)). The Texas Constitution contains similar protections: "No person, for the same offense, shall be twice put in jeopardy of life or liberty, nor shall a person be again put upon trial for the same offense, after a verdict of not guilty in a court of competent jurisdiction." TEX CONST. art. 1, § 14. Conceptually, the state and federal double jeopardy provisions are identical. *Phillips v. State,* 787 S.W.2d 391, 393 n. 2 (Tex.Crim.App.1990). Avilez has not provided argument or authority concerning the protection provided by the Texas Constitution or how that protection differs from the protection provided by the United States Constitution. State and federal constitutional claims should be argued in separate grounds, with separate substantive analysis or argument provided for each ground. *Muniz v. State,* 851 S.W.2d 238, 251–52 (Tex.Crim.App. 1993); *Heitman v. State,* 815 S.W.2d 681, 690 n. 23 (Tex.Crim.App.1991). We therefore confine our analysis to Avilez's federal constitutional arguments.

4. *Littrell,* 271 S.W.3d at 275.

5. *Id.* at 276.

6. *Id.* at 276 (citing *Missouri v. Hunter,* 459 U.S. 359, 368, 103 S.Ct. 673, 679, 74 L.Ed.2d 535 (1983)).

7. 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *see Littrell,* 271 S.W.3d at 276.

8. *Milner v. State,* 263 S.W.3d 353, 356 (Tex. App.-Houston [1st Dist.] 2008, no pet.) (citing *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182).

9. *See United States v. Dixon,* 509 U.S. 688, 696, 113 S.Ct. 2849, 2856, 125 L.Ed.2d 556 (1993).

10. *Ex parte Pool,* 71 S.W.3d 462, 466–67 (Tex. App.-Tyler 2002, no pet.) (citing *State v. Perez,* 947 S.W.2d 268, 272 (Tex.Crim.App.1997) ("[I]t is logical to compare statutory elements in the multiple punishments context where *Blockburger* is a rule of statutory construction to be used in determining legislative intent.")).

person to fear bodily injury, death or that an offense will be committed against the person's property. *Id.* § 42.072.

Comparing the statutory elements, each offense includes an element not included in the other. Violation of a protective order requires proof of a protective order, but stalking does not. Stalking requires proof that the defendant engaged in certain prohibited behaviors on more than one occasion, but violation of a protective order may be proven with only one instance of misbehavior. Because each offense includes an element not included in the other, we hold that violation of a protective order and stalking are not the same offense and double jeopardy does not preclude multiple punishments.[11] We overrule Avilez's first issue.

## JUDICIAL BIAS

In his second issue, Avilez contends that he is entitled to a new trial because the trial court was biased against him. Specifically, he challenges the trial court's repeated instructions to him to answer only the question asked, the relative latitude that the trial court afforded the State's witnesses compared with his own testimony, and the actions of the trial court in

twice holding him in contempt for nonresponsive narrative answers.[12] Avilez argues that the jury was "undoubtedly affected by the trial court's ceaseless and unnecessary admonishments" and that he himself "was undoubtedly prevented from being able to testify, except in an abbreviated manner, for fear he would be held [in] contempt."

## I. Preservation of Error

The State asserts that Avilez's issue is not preserved for our review. Avilez did not object to the alleged bias at any time during the guilt-innocence phase of trial, nor did he move for the judge's recusal. Ordinarily, to preserve an error for appellate review, the complaining party must make a "timely request, objection, or motion." [13]

▮▮▮▮▮ But some legal rights cannot be forfeited.[14] "Some rights are widely considered so fundamental to the proper functioning of our adjudicatory process as to enjoy special protection in the system." [15] Thus violations of rights that are "waivable only" and denials of "absolute, systemic requirements" are considered "fundamental error" and may be raised for the first time on appeal.[16] These rights

---

11. *See Rogers v. State*, 305 S.W.3d 164, 169–70 (Tex.App.-Houston [1st Dist.] 2009, no pet.).

12. The appellate record does not reflect that a final judgment was entered relating to findings of contempt against Avilez, and those findings are not challenged on appeal.

13. Tex.R.App. P. 33.1(a)(1); *Brewer v. State*, 572 S.W.2d 719, 721 (Tex.Crim.App.1978) (holding that when no objection is made, remarks and conduct of court may not be challenged on appeal unless they are fundamentally erroneous).

14. *See Saldano v. State*, 70 S.W.3d 873, 887–88 (Tex.Crim.App.2002); *Marin v. State*, 851 S.W.2d 275, 279 (Tex.Crim.App.1993), *overruled on other grounds, Cain v. State*, 947 S.W.2d 262, 264 (Tex.Crim.App.1997).

15. *Blue v. State*, 41 S.W.3d 129, 131 (Tex. Crim.App.2000) (plurality op.).

16. *Saldano*, 70 S.W.3d at 888 (citing *Marin*, 851 S.W.2d at 280); *see McLean v. State*, 312 S.W.3d 912, 915–16 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (explaining fundamental error). "A 'systemic requirement' (also known as an 'absolute requirement or prohibition') is a law that a trial court has a duty to follow even if the parties wish otherwise. Any party that is entitled to appeal may complain on appeal that such a requirement was violated, even if the party failed to complain about the failure or waived the application of the law." *Mendez v. State*, 138 S.W.3d 334, 340 (Tex.Crim.App.2004) (citing *Marin*, 851 S.W.2d at 280 (explaining differences between systemic error, which pertains to pres-

include, for example, the right to assistance of counsel (waivable) and jurisdiction over the person or subject matter of the case (systemic).[17] This Court has previously reviewed for fundamental error an unpreserved complaint that the trial court was not impartial.[18]

Avilez argues that the trial court's comments, conduct of the trial, and contempt rulings show that the trial court was biased. Assuming without deciding that Avilez's complaint, if valid, implicates the type of systemic error that we may address for the first time on appeal, we consider whether the trial court's actions violated Avilez's due process right to an impartial judge.[19]

## II. Due Process Right to a Neutral Judge

Avilez complains that he was denied a fair trial because the judge was biased. In support of this proposition, he notes that the trial court admonished him no fewer than 18 times before the jury, twice sua sponte instructed the jury to disregard his testimony, and twice held him in contempt of court due to his nonresponsive answers. Avilez contends that the trial court was far more lenient toward the State's witnesses. He claims to have been harmed because the jury was influenced by the trial court's

actions and because he was effectively precluded from presenting a complete defense for fear of being held in contempt.

Avilez relies upon two authorities for his argument that he was denied a fair trial. The first, *Brumit v. State*, Avilez offers for the proposition that "due process requires a neutral and detached hearing body or officer." [20] The other, *Dockstader v. State*, is offered for the proposition that reversal may be predicated on a finding that a judicial impropriety was committed and that prejudice probably resulted.[21] We construe Avilez's argument on appeal to be as follows: that the trial court was lenient and permissive with respect to testimony offered by the State, specifically from the complainant; that in contrast, the trial court intimidated Avilez and gave him essentially no latitude to present testimony while he was on the stand; that these actions by the trial court demonstrated bias and therefore deprived Avilez of a fair trial in derogation of his due process rights; and that Avilez was specifically harmed because of a presumed impact on the jury from the trial judge's conduct and because Avilez presumably was unable to offer complete testimony. As we explain below, the appellate record before us is inadequate to support a conclusion that

ervation, and structural error, which pertains to harm analysis)).

**17.** *Saldano,* 70 S.W.3d at 888.

**18.** *Jaenicke v. State,* 109 S.W.3d 793, 796 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd); *see also Richardson v. Quarterman,* 537 F.3d 466, 473 (5th Cir.2008) ("Structural errors occur only in a very small class of cases, such as when a trial judge is actually biased."); *Arnold v. State,* No. 05–07–00120–CR, 2008 WL 3307079, at *5 (Tex.App.-Dallas July 31, 2008, no pet.) (not designated for publication) (holding that trial court objection not required to preserve issue for appeal and noting that lack of impartial trial judge is structural error not subject to harmless error analysis).

**19.** *See Brumit v. State,* 206 S.W.3d 639, 644–45 (Tex.Crim.App.2006) ("We need not decide today whether an objection below is required to preserve an error of this nature on appeal because the record here does not reflect partiality of the trial court or that a predetermined sentence was imposed."); *accord McLean,* 312 S.W.3d at 917.

**20.** *Brumit,* 206 S.W.3d at 645.

**21.** 233 S.W.3d 98, 108 (Tex.App.-Houston [14th Dist.] 2007, pet. ref'd) (citing *Markowitz v. Markowitz,* 118 S.W.3d 82, 86 (Tex.App.-Houston [14th Dist.] 2003, pet. denied)); *see also Metzger v. Sebek,* 892 S.W.2d 20, 39 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

Avilez's trial was fundamentally unfair so as to require reversal.

 We begin with first principles. The Fourteenth Amendment provides that the State may not "deprive any person of life, liberty, or property, without due process of law."[22] A neutral and detached judge is one of the minimum requirements of due process in criminal proceedings.[23] " 'A fair trial in a fair tribunal is a basic requirement of due process.' "[24] Due process requires that a criminal trial be held "before a judge with no actual bias against the defendant or interest in the outcome of his particular case."[25] And due process will not permit a judge to assume the role of a prosecutor.[26] It is important to note, however, that not every complaint about a judge or the conduct of a trial implicates constitutional due process protections. Indeed, " 'most matters relating to judicial disqualification [do] not rise to a constitutional level,' "[27] and " 'matters of kinship, personal bias, state policy, remoteness of

---

**22.** U.S. Const. amend. XIV; *see also* Tex. Const art. I, § 19 ("No citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disfranchised, except by the due course of the law of the land.").

**23.** *See, e.g., Ward v. Vill. of Monroeville, Ohio*, 409 U.S. 57, 59–62, 93 S.Ct. 80, 82–84, 34 L.Ed.2d 267 (1972); *Morrissey v. Brewer*, 408 U.S. 471, 489, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972); *Brumit*, 206 S.W.3d at 645 (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973)); *Jaenicke*, 109 S.W.3d at 796; *Vogt v. Bexar County*, 5 Tex.Civ.App. 272, 23 S.W. 1044, 1046 (Tex.Civ.App. 1893, writ ref'd) ("due process of law requires that a person shall have . . . a reasonable opportunity to be heard before an impartial tribunal").

**24.** *Caperton v. A.T. Massey Coal Co., Inc.,* —— U.S. ——, 129 S.Ct. 2252, 2259, 173 L.Ed.2d 1208 (2009) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955)).

**25.** *Bracy v. Gramley*, 520 U.S. 899, 905, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821–22, 106 S.Ct. 1580, 1585–86, 89 L.Ed.2d 823 (1986), and *Tumey v. Ohio*, 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927)). For example, a criminal defendant's due process rights are violated when the trial judge has a pecuniary interest in his case. *E.g., Lavoie*, 475 U.S. at 816–18, 822, 106 S.Ct. at 1582–83, 1585 (holding that appellant's due process rights were violated when state supreme court justice cast deciding vote in case, which had effect of increasing settlement value of justice's own pending lawsuit); *Tumey*, 273 U.S. at 532, 47 S.Ct. at 444 (holding that appellant's due process rights were violated when mayor received compensation for his statutorily-mandated judicial duties only if defendant was convicted).

**26.** *In re Murchison*, 349 U.S. at 137, 75 S.Ct. at 626 ("Fair trials are too important a part of our free society to let prosecuting judges be trial judges of the charges they prefer."). A trial court's impartiality can be compromised when the trial judge acts as both prosecutor and judge, as in certain criminal contempt cases, or when the judge exhibits hostility toward the defendant or his lawyer. *E.g., id.* at 138–39, 75 S.Ct. at 626–27 (disapproving of "spectacle" of trial judge presenting testimony that he must consider in adjudicating guilt or innocence); *Mayberry v. Pennsylvania*, 400 U.S. 455, 465, 91 S.Ct. 499, 505, 27 L.Ed.2d 532 (1971) ("Whether the trial be federal or state, the concern of due process is with the fair administration of justice. At times a judge has not been the image of the 'the impersonal authority of law' but has become so 'personally embroiled' with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge."); *see also Earley v. State*, 855 S.W.2d 260, 262–63 (Tex. App.-Corpus Christi 1993, pet. dism'd) (holding that trial court violated defendant's due process rights by prejudging the defendant in probation-revocation case because trial court said, "I am just upset that you did a third-degree felony. I would rather have seen you with a first-degree, because I would like to give you life.").

**27.** *Caperton*, 129 S.Ct. at 2259 (quoting *FTC v. Cement Institute*, 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948)).

interest, would seem generally to be matters merely of legislative discretion.'"[28]

Avilez does not argue that the trial court was biased in the sense of having a pecuniary or other direct personal interest in the outcome of his case. Nor does he argue that, in regulating the testimony and conduct of the trial, the trial court functioned as a prosecutor, prejudged his case, became embroiled with him or his counsel, or showed a personal favoritism toward the prosecution. Thus, his complaints do not raise the kind of fundamental procedural unfairness that the Supreme Court has held to be an unconstitutional violation of due process rights.[29]

Rather, Avilez argues that his trial was unfair because the trial court allowed the State's witnesses great leeway in testifying but actively managed and limited his own testimony. This complaint implicates matters peculiarly within the trial court's discretion, i.e., the regulation of testimony, processing of evidence, and general conduct of the trial.[30] We have reviewed the entire record. Throughout the entire trial, the trial court exercised the kind of control contemplated by Rule of Evidence 611. The court admonished both prosecution and defense witnesses to limit their answers to questions calling for a "yes" or "no" response, and the court repeatedly advised the lawyers at bench conferences and outside the presence of the jury not to elicit testimony that would

be irrelevant to the offenses charged or the time period involved. The trial court reminded the attorneys about his desire to avoid unnecessary prurient details and that he wanted them to present only evidence that was relevant to an element of the charged offense. The trial court exercised its discretion during both the State's case-in-chief, for example admonishing Amanda and Zach, and during the defense case, admonishing Avilez and his mother.

As we have already observed, Avilez did not preserve a challenge to the trial court's exercise of its discretion in these rulings, and he does not challenge any particular ruling on appeal as an abuse of the trial court's discretion. Thus, whether the trial court abused its discretion is not properly before us in this appeal. *See* TEX.R.APP. P. 33.1. Moreover, Avilez directs us to no trial objections, requests for jury instructions, contemporaneous offers of proof regarding testimony the trial court "undoubtedly" prevented him from offering, or motion for new trial or hearing thereon. Had such objections and offers been made at trial, it is conceivable that the trial court may have reconsidered some of its rulings, allowed Avilez greater latitude in his testimony, or permitted specific testimony essential to Avilez's defense. Or we might have been able to correct a trial error on appeal. But without such a record, we are unable to discern any fundamental unfair-

---

**28.** *Id.* (quoting *Tumey,* 273 U.S. at 523, 47 S.Ct. 437).

**29.** *See Lavoie,* 475 U.S. at 816–18, 822, 106 S.Ct. at 1582–83, 1585 (pecuniary interest); *Tumey,* 273 U.S. at 532, 47 S.Ct. at 444 (same); *In re Murchison,* 349 U.S. at 137, 75 S.Ct. at 626 (acting as prosecutor); *Mayberry,* 400 U.S. at 465, 91 S.Ct. at 504–05 (personal embroilment with defendant or counsel); *Earley,* 855 S.W.2d at 262–63 (prejudging case); *Abdygapparova v. State,* 243 S.W.3d 191, 206–09 (Tex.App.-San Antonio 2007, pet. ref'd) (favoring prosecution).

**30.** *See* TEX.R. EVID. 611 ("The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment."); *see also State ex rel. Rosenthal v. Poe,* 98 S.W.3d 194, 199 (Tex.Crim.App. 2003) ("[A] trial court's inherent power includes broad discretion over the conduct of its proceedings.").

ness that could rise to the level of a due process violation.[31]

 Finally, we note that most matters related to judicial conduct within the broad confines of the discretion traditionally afforded to a trial court do not implicate constitutional due process protections.[32] For example, the Texas Code of Judicial Conduct provides that "[a] judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers, and others with whom the judge deals in an official capacity. . . ."[33] We do nothing to diminish this highly appropriate expectation of the judiciary by further observing that a judge's alleged failure to meet the standard does not necessarily, and in the absence of contemporaneous objections usually will not, constitute grounds for reversible error.[34] Indeed, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion," and a trial court's opinion would not constitute bias unless it derives from "an extrajudicial source . . . [or] reveal[s] such a high degree of favoritism or antagonism as to make fair judgment impossible."[35]

We conclude that the record does not clearly demonstrate bias or a violation of Avilez's due process rights, and we hold that Avilez has not overcome the presumption that trial court acted correctly.[36] We therefore overrule Avilez's second issue.

## CONCLUSION

We affirm the judgments of the trial court.

Justice SHARP, concurring in judgment.

JIM SHARP, Justice, concurring.

The trial transcript in this case documents a trial court that

- mocked the defendant:

 TRIAL COURT: Let's go. Mr. Avilez, are we clear on this?

 AVILEZ: Yes, sir. With all due respect, I'm just trying to gather my thoughts. I apologize.

 TRIAL COURT: I believe you're trying to answer questions that have not been asked. That's the reason I sent the jury out with all due respect.

- was hostile:

 AVILEZ: May I speak to my Counsel for a minute, sir?

 TRIAL COURT: No, sir, not unless he comes up here.

- was intimidating:

 At the beginning of Avilez's testimony, his attorney asked him where he grew up, and he responded, "I lived basically all my life in Pasadena, but I have lived around different places. I used to live—." The trial court inter-

---

**31.** *See, e.g., Potier v. State,* 68 S.W.3d 657, 665 (Tex.Crim.App.2002) (holding that "the exclusion of a defendant's evidence will be constitutional error only if the evidence forms such a vital portion of the case that exclusion effectively precludes the defendant from presenting a defense").

**32.** *E.g., Bracy,* 520 U.S. at 904, 117 S.Ct. at 1797 (holding that most questions concerning judge's qualifications to hear case are "answered by common law, statute, or the professional standards of the bench and bar").

**33.** Tex. Code Jud. Conduct, Canon 3, reprinted in Tex. Gov't Code Ann., tit. 2, subtit. G app. B. (Vernon 2005).

**34.** *See, e.g., Kemp v. State,* 846 S.W.2d 289, 305 (Tex.Crim.App.1992) (quoting *Shapley v. Tex. Dep't of Human Res.,* 581 S.W.2d 250, 253 (Tex.App.-El Paso 1979, no writ)).

**35.** *Liteky v. United States,* 510 U.S. 540, 555–56, 114 S.Ct. 1147, 1157, 127 L.Ed.2d 474 (1994).

**36.** *See Brumit,* 206 S.W.3d at 645 (citing *Thompson v. State,* 641 S.W.2d 920, 921 (Tex. Crim.App.1982)).

rupted him and instructed him to answer the question. His attorney then asked him if he graduated from high school, and Avilez responded, "With honors, sir." The trial court immediately removed the jury and admonished him.

- was unreasonable toward appellant: Avilez's attorney asked him, "What—did you actually work for the National—NASA? I can't remember the acronym. National Aeronautic—whatever it is. Anyway, or did you work for a subcontractor?" and he responded, "Actually, the name of the subcontractor is United States Space Alliance. It's the major subcontractor." The trial court again removed the jury to admonish Avilez again.

- and exhibited a marked antipathy toward Avilez: *sua sponte* interrupting Avilez's testimony repeatedly and frequently, admonishing Avilez and threatening him with contempt after reasonable attempts by Avilez to answer the questions put to him, removing the jury four times during Avilez's testimony, and twice holding him in contempt for providing the type of answers that are routine in any given jury trial.

Despite the potential prejudice that may have been caused by the actions and attitude of the trial court, the record is void of any admonishments to the jurors to not allow the interruptions and their frequent removal from the court to be construed against the defendant.

Such repeated dramatic exercises by the court cannot but have been noted by the jurors. Although the record before us is inadequate to determine whether, and to what extent, the trial court's behavior affected the jury's verdict—and we cannot engage in speculation—the mere prospect of the court prejudicing the jury weighs ponderously heavy upon the balance of Lady Justice's scales.

Nevertheless, whatever the potential impact of the trial court's behavior on the jury, because no challenge to any particular court action or ruling was preserved, and no complaint was raised on appeal about the kind of fundamental procedural unfairness that could be held an unconstitutional violation of due process rights, we have no avenue by which to review this trial court's behavior that may have caused appellant to have an unfair trial.

For this reason, I very reluctantly concur in the judgment in this case.