

## NUMBER 13-21-00349-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI – EDINBURG

JOHNNY ESPARZA,                                                                     Appellant,

v.

THE STATE OF TEXAS,                                                                  Appellee.

**On appeal from the 347th District Court
of Nueces County, Texas.**

## MEMORANDUM OPINION

**Before Justices Benavides, Hinojosa, and Silva
Memorandum Opinion by Justice Benavides**

Appellant Johnny Esparza was convicted of aggravated robbery and engaging in organized criminal activity, both first-degree felonies, and sentenced to concurrent fifty-year terms of imprisonment for each count. *See* TEX. PENAL CODE ANN. §§ 29.03(b), 71.02(b)(3). By two issues, Esparza argues that (1) the trial court committed fundamental

error by acting as an advocate in its questioning of witnesses, and (2) he was denied effective assistance of counsel. We affirm as modified.

## I. BACKGROUND

On May 31, 2019, a grand jury indicted Esparza on three counts: (1) aggravated robbery, (2) engaging in organized criminal activity, and (3) murder. On September 28, 2021, Esparza waived his right to a jury trial, and a bench trial began. We summarize the relevant portions of the proceedings as follows:

### A. Deion Brunson's Testimony

Deion Brunson testified that he had been friends with Parris Tipton, the deceased, since middle school. According to Brunson, on February 24, 2019, he visited the apartment Tipton shared with his sister. Later in the day, around "3:00 or 4:00ish," Esparza arrived. During this part of Brunson's testimony, the following colloquy occurred:

| [THE STATE]: | Okay. And where was your house located—or his house? I'm sorry, I believe you said it was his house. |
|---|---|
| THE COURT: | I don't need an address if you don't want to say it out loud. |
| [BRUNSON]: | It was— |
| THE COURT: | South side, west side. |
| [BRUNSON]: | South side. |
| THE COURT: | I mean, you can get to Nueces County, but I don't need his address. |

Brunson eventually testified that Tipton's residence was in Nueces County. According to Brunson, the three men were pondering ways to make money when Esparza came up with the plan "[t]o rob somebody." Esparza worked out the details of who to rob, and the

2

men agreed to rob this person under the guise of a drug deal. The men arranged to buy drugs from a third party, but their true intent was to steal the drugs and resell them.

After the plan was laid, Brunson observed Esparza acquire a gun from a nearby grocery store and provide that gun to Tipton. According to Brunson, Esparza also showed Tipton and Brunson his "personal gun," which he brought with him to the robbery.

Later that evening, the three men drove to an apartment complex where they agreed to meet the potential robbery victim. The trial court questioned Brunson about the scene of the incident:

> [BRUNSON]: When I got to the park, I had—I was just waiting for them, I guess you would say.
>
> THE COURT: Did you arrive together?
>
> [BRUNSON]: Yes. We all pulled up to the apartments. And we were at the apartments waiting for, I guess, the person to—to arrive.
>
> THE COURT: Okay. I thought you went to a park.
>
> [BRUNSON]: No. We had went [sic] to the—the park is right by the apartments.
>
> THE COURT: Okay. Someone's got to do a better job of telling me the story, because I'm not getting it.

Brunson clarified that he dropped Esparza and Tipton off at the apartment complex, and he waited in the car next to a nearby park. After about five minutes of waiting, Brunson "heard . . . gun shots" and then observed Esparza "[s]hooting his gun." Brunson later testified that he heard two rounds of gunfire that were "in sync right after another" and believed the second round may have been from a semi-automatic weapon "from the way [it] sounded." The trial court attempted to clarify this issue:

3

THE COURT:    Okay. Wait. I'm—I'm fuzzy on this.

So[,] earlier when you testified that you were in the vehicle and then all of a sudden you heard shooting, right. And then you looked up and you see [Esparza] running towards your car and shooting at the same time; is that correct?

[BRUNSON]:    Yes.

. . . .

THE COURT:    When do you hear this AK-47, pow, pow, pow, pow?

[BRUNSON]:    There was no AK-47. I didn't know why [defense counsel] was asking me about that.

THE COURT:    Okay. Well, you indicated, "I thought it was an automatic." Was it more than one shot back? Was it somebody else's gun?

[BRUNSON]:    I heard the first shots, and I didn't—I didn't hear no [sic] AK-47.

THE COURT:    Okay. And the first shots were from who?

[BRUNSON]:    I guess from wherever they initially were at first.

THE COURT:    Okay. So[,] you hear some shots?

[BRUNSON]:    Yes.

THE COURT:    And then you're saying those weren't [Esparza]'s?

[BRUNSON]:    No. Yes. I heard—I heard some shots first and as I ducked down, I looked back up and that's when [Esparza] was running towards the vehicle shooting.

THE COURT:    Okay. But were those first shots [Esparza]'s shots or somebody from—

[BRUNSON]:    I don't know.

THE COURT:    You don't know?

4

[BRUNSON]:    No, ma'am.

When Esparza reached the vehicle, Brunson asked him about Tipton's whereabouts. Esparza "got out of the car, and he looked around and [Tipton] was on the [ground]." During his testimony, Brunson acknowledged that he did not know whether Esparza carried Tipton from the apartments to his car, to which the trial court interjected:

THE COURT:    Well, did you see him?

[BRUNSON]:    Yeah, that's what—it didn't—that wouldn't make sense, though, because—

THE COURT:    So[,] listen to the question, okay. Because you can't just sit there if I say, you know—you have to listen, right. You have to listen because it's very important. And so[,] if he asks you, you know, was he juggling on the way out, don't just go, 'I don't know.' You saw it. Was he juggling or was he not juggling?

[BRUNSON]:    Okay.

THE COURT:    Right? Was he carrying [Tipton] or not carrying [Tipton]?

. . . .

THE COURT:    When you saw him run towards the car and him shooting, did he have something over his shoulders? Did he have anything? Did you—Put that vision in your head. What did you see?

[BRUNSON]:    I just seen [sic] him shooting his gun. I wasn't to[o] into detail.

Brunson testified that Esparza then "dragged [Tipton] and put him in [Brunson's] back seat." He observed that Tipton "was all bloody and shot."

The men left the scene and, eventually, Brunson called Tipton's mother, who advised him to take Tipton to the hospital. According to Brunson, Esparza said "[a]t least

5

two or three" times that "he wasn't going to go" to the hospital with Brunson. When they were "down the street" from the hospital, Esparza "jumped out [of] the car." Brunson took Tipton to the hospital, where he later expired.

**B.      Ralph Espinoza's Testimony**

Ralph Espinoza testified that, "to make a little bit of extra side money," he would sometimes sell drugs. On the night of the incident, Espinoza arranged to sell six bottles of "promethazine with codeine," colloquially known as "[d]rank," to Esparza for roughly $900. Espinoza agreed to drive from Ingleside to Corpus Christi to meet with Esparza at an apartment complex.

When Espinoza arrived at the apartments, Esparza entered his car and sat in the back passenger seat. Espinoza testified that he noticed the backpack Esparza brought with him was "bottom heavy," which put him "on edge." The two began the faux transaction, but when Esparza began counting the money, Tipton "open[ed] the door and put[] a gun to [Espinoza's] head." Tipton told Espinoza, "Don't move or I'm going to shoot you." He then told Esparza to "grab the stuff" and "get their phones and wallets, too." While this was happening, Espinoza was attempting to reach the gun he kept underneath his car seat. According to Espinoza, when he was finally able to grab the gun, Tipton "just started shooting, and then [Espinoza] started shooting." Later in his testimony, Espinoza acknowledged that "the cops told [him] that [Tipton] didn't" shoot, but that there was "one live round" in the chamber "from when he cocked the [gun] right by [Espinoza's] door."

After Espinoza finished shooting, he saw Esparza and Tipton running across the

6

parking lot. Espinoza denied shooting Tipton in the back.[1] He also testified that a murder charge against him was no-billed.

## C. Esparza's Testimony

According to Esparza, it was Tipton's idea to buy and resell the drugs. Esparza testified that his response to this idea was, "Well, okay. Why not." Esparza contacted Espinoza via Snapchat to arrange to buy six bottles of promethazine with codeine for about $900. He determined that they "could resell it for $300 a bottle and make $1,800 off of that." Esparza denied possessing a gun during the drug deal turned robbery turned shooting. He also denied that he ever discussed robbing Espinoza with Tipton and Brunson.

When he arrived at the drug deal, Esparza entered the back passenger seat of Espinoza's car. Esparza testified that when he started counting the money to give to Espinoza, Tipton came "running around the side and pull[ed] the gun on [Espinoza]." Esparza heard Tipton tell Espinoza, "Shut the hell up or I'm going to shoot you."

Esparza reportedly asked Tipton, "What the hell are you doing?" and Tipton told him to "grab the shit," "[g]rab their wallets," and "[g]rab their phones." Esparza testified that he then grabbed the bottles, exited the vehicle, and started running. After he "was already about a good 30 yards from the car," he glanced back and saw Tipton running and Espinoza firing his gun. When Tipton and Esparza met up, Tipton relayed that he thought he had been "hit."

---

[1] Tipton's autopsy report was admitted into evidence. The report showed that Tipton's "right outer back area ha[d] . . . [a] 7 mm round entrance gunshot wound" and that he sustained another "7 millimeter round entrance gunshot wound" on "[t]he lateral surface of [his] right thigh."

7

Esparza testified that it was his idea to bring Tipton to the hospital, but acknowledged that he later told Brunson, "We can't go to the hospital. I can't go to the hospital like this. We got a pistol in the car in this bag. There's money. There's [sic] drugs." At some point, Esparza exited the car and called his mother to come pick him up.

## D.    Trial Court's Judgment

At the conclusion of his trial, the State dismissed the pending murder charge against Esparza. The court found Esparza guilty of aggravated robbery and engaging in organized criminal activity, and it sentenced him to fifty years' imprisonment for each offense, with the sentences to run concurrently. This appeal followed.

## II.    NEUTRAL AND DETACHED MAGISTRATE

By his first issue, Esparza argues that the trial court assumed the role of an advocate by questioning witnesses during the guilt phase of the bench trial.

## A.    Applicable Law & Standard of Review

"Due process requires a neutral and detached hearing body or officer." *Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 786 (1973)). A judge must not: (1) have an actual bias against the defendant, (2) have an interest in the outcome of the defendant's case, or (3) assume the role of a prosecutor. *See Avilez v. State*, 333 S.W.3d 661, 673 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd); *see also White v. State*, No. 05-17-00397-CR, 2018 WL 1940515, at *1 (Tex. App.—Dallas Apr. 25, 2018, pet. ref'd) (mem. op., not designated for publication). However, absent a clear showing that the factfinder abandoned its role as a neutral and detached magistrate, "a trial court's actions will be presumed to have been correct."

8

*Brumit*, 206 S.W.3d at 645 (citing *Thompson v. State*, 641 S.W.2d 920, 921 (Tex. Crim. App. [Panel Op.] 1982), *disagreed with on other grounds by Estep v. State*, 901 S.W.2d 491, 494 (Tex. Crim. App. 1995)).

"Texas is 'second to none' in its disapproval of judges' examination of witnesses during a jury trial . . . ." *Galvan v. State*, 988 S.W.2d 291, 297 (Tex. App.—Texarkana 1999, pet. ref'd). "A primary concern in allowing active participation by judges is the danger that the judge will somehow convey his opinion of the case to the jury and ultimately influence their decision." *Morrison v. State*, 845 S.W.2d 882, 886 n.10 (Tex. Crim. App. 1992). Nevertheless, "[a] trial judge is permitted to question a witness when seeking information only, to clarify a point, or to get the witness to repeat something that the judge could not hear." *Moreno v. State*, 900 S.W.2d 357, 359 (Tex. App.—Texarkana 1995, no pet.); *see Brewer v. State*, 572 S.W.2d 719, 721 (Tex. Crim. App. [Panel Op.] 1978); *Ash v. State*, 420 S.W.2d 703, 705 (Tex. Crim. App. 1967).

In a bench trial, a trial court has even more latitude to question witnesses to assist it in its factfinding role. *See Moreno*, 900 S.W.2d at 359–60; *see also Gale v. State*, No. 05-17-00592-CR, No. 05-17-00595-CR, No. 05-17-00596-CR, 2018 WL 3434511, at *5 (Tex. App.—Dallas July 17, 2018, pet. ref'd) (mem. op., not designated for publication) ("Though not favored, even extensive and adversarial questioning by a trial judge is permissible in a bench trial as long as the questions are relevant to the issues before the court and the judge's impartiality is not affected."); *Long v. State*, No. 13-13-00579-CR, 2015 WL 234021, at *5 (Tex. App.—Corpus Christi–Edinburg Jan. 15, 2015, pet. ref'd) (mem. op., not designated for publication). But a judge must be mindful that in "the zeal

9

of his or her active participation," he or she "may become an advocate in the adversarial process and lose the neutral and detached role required for the fact finder and the judge." *Moreno*, 900 S.W.2d at 359.

Esparza acknowledges that he failed to object to the trial court's remarks below. Generally, as a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion. TEX. R. APP. P. 33.1(a). However, a defendant may complain of a trial court's partiality for the first time on appeal "so long as the trial judge's conduct is so egregious as to deem the judge biased on the matter." *Hernandez v. State*, 268 S.W.3d 176, 184 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.); *see Villarreal v. State*, 504 S.W.3d 494, 523 (Tex. App.—Corpus Christi–Edinburg 2016, pet. ref'd); *see also Proenza v. State*, 541 S.W.3d 786, 801 (Tex. Crim. App. 2017) (holding that "the right to be tried in a proceeding devoid of improper judicial commentary is at least a . . . waiver-only right"); *Nelson v. State*, No. 05-18-00938-CR, 2019 WL 2121051, at *3 (Tex. App.—Dallas May 15, 2019, no pet.) (mem. op., not designated for publication) ("In light of *Proenza*, we will assume, without deciding, that [appellant] was not required to object to the trial judge's questions in order to raise his complaint on appeal.").

## B. Analysis

Esparza does not complain that the court had an actual bias against him or that it had an interest in the outcome of his case. *See Avilez*, 333 S.W.3d at 673. Instead, he argues that the trial court was not acting "as a neutral and detached fact finder, but [as] an advocate for the State." We examine the trial court's remarks, bearing in mind the

10

presumption that the trial court behaved properly, to determine whether the trial court assumed the role of a prosecutor. *See id.*

Esparza excepts to the court's interjection after the State asked Brunson, "And where was your house located—or his house? I'm sorry, I believe you said it was his house." According to Esparza, the trial court was "reminding the prosecutor about establishing the jurisdictional element of Nueces County."[2] However, the State had already asked Brunson about the location of the apartment. Because it was not clear whose address the State was requesting, the trial court had the inherent authority to "exercise reasonable control over the mode . . . of examining witnesses and presenting evidence" so as to "protect witnesses from harassment or undue embarrassment." TEX. R. EVID. 611(a)(3). By permitting Brunson to merely share the general area of the apartment he was discussing, the trial court was protecting Brunson from disclosing the exact address of what it may have assumed was his personal residence.

Citing no authority, Esparza argues that "[w]hen the trial court poses additional questions to the State's witnesses that shore up shortcomings in the State's case, and when the trial court's questions prove elements of the State's case, the trial court has become an advocate." But in a bench trial, a trial court may ask questions that an advocate would ordinarily ask to assist it in its factfinding capacity. *Moreno*, 900 S.W.2d at 359–60. The court asked Brunson and Espinoza questions that would be permitted of either attorney, such as asking for a description of the manner in which Brunson

---

[2] We note that venue was not challenged below. Because of this, we are required to presume that venue was established as the record does not contain affirmative evidence to the contrary. *See* TEX. R. APP. P. 44.2(c)(1).

11

witnessed Esparza running and shooting, whether Tipton was conscious when he made it to the hospital, and whether Espinoza saw either Tipton or Esparza shoot. *See id.* Other comments made by the court, such as "[w]ait . . . I'm fuzzy on this," were points of clarification that were within its authority to make. *See Brewer*, 572 S.W.2d at 721.

Because the questions and comments to which Esparza objects were permitted, Esparza has not rebutted the presumption that the trial court's actions here were appropriate. *See Avilez*, 333 S.W.3d at 673. Thus, we cannot hold that these remarks were "so egregious as to deem the judge biased on the matter." *See Hernandez*, 268 S.W.3d at 184; *see also Proenza*, 541 S.W.3d at 800 ("[I]f a judicial comment is found to be errorless or insignificant in the context of a particular trial, that is a good reason to conclude that any resulting claim of error should be denied on its merits or else declared harmless . . . ."). We therefore overrule Esparza's first issue.

### III.    INEFFECTIVE ASSISTANCE OF COUNSEL

Esparza asserts his trial counsel rendered ineffective assistance by failing to object to: (1) the trial court's questions and comments; (2) hearsay evidence; (3) leading questions; and (4) the length of Esparza's sentence.

### A.    Standard of Review & Applicable Law

To obtain a reversal of a conviction for receiving ineffective assistance of counsel, an appellant must show two things. First, an appellant must show that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "There is a strong

12

presumption that counsel's conduct fell within the wide range of reasonable professional assistance." *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Judicial scrutiny of the performance of trial counsel is highly deferential. *Strickland*, 466 U.S. at 689.

"Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Ex parte Napper*, 322 S.W.3d 202, 248 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 694).

## B. Analysis

### 1. Objecting to Trial Court's Questions

Esparza contends that "[i]t is reasonable to think that had trial counsel objected when the trial court examined the State's witnesses, the trial court would have refrained from such actions going forward." This may well be a reasonable hypothesis, but the court of criminal appeals has expressly noted that an objection that calls into question a judge's impartiality will often be futile. *See Proenza*, 541 S.W.3d at 799 ("An objection under these circumstances would be futile at best, and at worst could reinforce to the jury that the trial judge stands solidly in the corner of the opponent."). We have also concluded that the trial court did not err by making its remarks. Thus, counsel did not render ineffective assistance by failing to object to them. *See Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex.

13

Crim. App. 2011) ("To successfully assert that trial counsel's failure to object amounted to ineffective assistance, the applicant must show that the trial judge would have committed error in overruling such an objection.").

### 2. Hearsay

Esparza also argues that trial counsel was deficient by failing to object to certain hearsay statements. According to Esparza, the testimony elicited from Brunson concerning Esparza's own statements in concocting the robbery scheme was inadmissible hearsay. However, this testimony did not contain hearsay, as the statements were made by a party opponent. *See* TEX. R. EVID. 801(e)(2)(A) (excluding from the general rule against hearsay statements that are "offered against an opposing party" and were "made by the party in an individual or representative capacity").

Esparza also insists that trial counsel could not have had a reasonable strategy for failing to object to Espinoza's testimony that Tipton threatened to shoot him, and that Tipton told Esparza to "grab the stuff." This argument is unpersuasive in light of Esparza's own testimony that Tipton told Espinoza to "[s]hut the hell up or I'm going to shoot you" and commanded him to "grab the shit." Further, these statements would also have been excluded from the general rule against hearsay, as they were made by a co-conspirator during and in furtherance of the conspiracy. *See id.* R. 801(e)(2)(E) (excluding from the general rule against hearsay statements that are "offered against an opposing party" and were "made by the party's coconspirator during and in furtherance of the conspiracy"). In sum, Esparza has not established that the contested evidence was inadmissible and therefore has failed to meet the first prong of *Strickland*. *See Ex parte Martinez*, 330

14

S.W.3d at 901.

### 3. Leading Questions

Without citing any authority, Esparza argues that "[t]here is no reason for trial counsel not to object to the leading questions propounded at trial." But the burden to prove that trial counsel's strategy was ineffective is not met merely by asserting a conclusory statement. *See Thompson*, 9 S.W.3d at 814. Esparza does not argue that, had the trial court sustained a leading objection and the prosecutor rephrased her question, the testimony would not be admissible. *See Wheeler v. State*, 433 S.W.3d 650, 655–56 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). Trial counsel does not render ineffective assistance by failing to object when the evidence sought in perhaps an objectionable manner will come in anyway. *See id.* "When the record is silent concerning why defense counsel failed to object to the State's use of leading questions, the appellant fails to rebut the presumption that this conduct constitutes reasonable trial strategy." *Id.* at 655.

### 4. Sentence Length

Lastly, Esparza asserts that his trial counsel rendered ineffective assistance by failing to object to the length of his sentence. He argues that a conclusion that Esparza's sentence was proportionate to the harm caused is vitiated by certain mitigating factors, such as his lack of prior criminal history.

The Eighth Amendment of the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. It is undisputed that the appropriate punishment range

15

for the offenses in this case was confinement for a period between five years and life. *See* TEX. PENAL CODE ANN. § 12.32(a). Generally, when the sentence imposed is within the statutory limits, it is not considered "excessive, cruel, or unusual." *State v. Simpson*, 488 S.W.3d 318, 323 (Tex. Crim. App. 2016); *Alvarez v. State*, 525 S.W.3d 890, 892 (Tex. App.—Eastland 2017, pet. ref'd). However, "an individual's sentence may constitute cruel and unusual punishment, despite falling within the statutory range, if it is grossly disproportionate to the offense." *Alvarez*, 525 S.W.3d at 892 (citing *Solem v. Helm*, 463 U.S. 277, 287 (1983)). It is only in the "exceedingly rare or extreme case" that a sentence will be considered grossly disproportionate. *Simpson*, 488 S.W.3d at 322–23.

In conducting a proportionality analysis, we "must judge the severity of the sentence in light of the harm caused or threatened to the victim[s], the culpability of the offender, and the offender's prior adjudicated and unadjudicated offenses." *Id.* at 323; *see Graham v. Florida*, 560 U.S. 48, 60 (2010); *Bolar v. State*, 625 S.W.3d 659, 666 (Tex. App.—Fort Worth 2021, no pet.). If we conclude that this initial comparison does not create an inference that the sentence is grossly disproportionate, our analysis ends, and the sentence is not cruel and unusual. *See Simpson*, 488 S.W.3d at 323.

Although he was not the intended victim of the robbery, Esparza's actions of planning the heist and providing him with a gun played a significant, albeit indirect, role in causing Tipton's death. And this was a risk that was either ignored or disregarded by the men when they brought a gun to a robbery: that someone—anyone—could be killed. Esparza's lack of prior criminal history does not negate the major role he played in bringing about the serious harm caused or threatened to the victims in this case. Thus,

16

this is not one of the "exceedingly rare or extreme" cases where we can infer gross disproportionality. *See id.* at 322–23.

To show that counsel's failure to object to the length of his sentence amounted to ineffective assistance, Esparza was required to show there was a reasonable probability that, but-for counsel's unprofessional error, the result of the proceeding would have been different. *See Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002) (citing *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002)). Having concluded that Esparza's sentence was not grossly disproportionate, we hold that Esparza has failed to meet this burden. *See id.*; *Jacoby v. State*, 227 S.W.3d 128, 233 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd); *see also Mitchell v. State*, No. 02-09-00374-CV, 2010 WL 4925023, at *3 (Tex. App.—Fort Worth Dec. 2, 2010, no pet.) (mem. op., not designated for publication).

We therefore overrule Esparza's second issue.

#### IV.   MODIFICATION OF JUDGMENT

The State directs this Court's attention to two errors in the trial court's judgment. First, the judgment is titled "JUDGMENT OF CONVICTION BY JURY," despite the record reflecting that Esparza waived his right to a jury trial and consented to the trial court conducting both the guilt-innocence and punishment phases of trial. Second, it incorrectly states that the "Verdict of [the] Jury" was guilty; again, despite evidence in the record establishing that a jury trial did not occur.

"This court has the power to correct and reform the judgment of the court below to make the record speak the truth when it has the necessary data and information to do so,

17

or make any appropriate order as the law and the nature of the case may require." *See Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). We therefore modify the trial court's judgment by (1) retitling the document "JUDGMENT OF CONVICTION BY COURT"; and (2) editing the provision that reads "Verdict of Jury" to read "Verdict of Court." *See id.*; TEX. R. APP. P. 43.2(b).

## V.     CONCLUSION

We affirm the trial court's judgment as modified.

GINA M. BENAVIDES
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed on the
6th day of October, 2022.