

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00094-CR

———————————————

BRANDON TREMELL JOHNSON, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1442453D

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

At a hearing on the State's third petition to proceed to adjudication, Appellant Brandon Tremell Johnson pled true to multiple violations of his deferred adjudication probation conditions. Each side then presented witnesses, some of whom were questioned by the trial judge. At the end of the hearing, the judge revoked Johnson's probation, adjudicated him guilty, and sentenced him to six years' confinement. On appeal, Johnson contends that the judge's questioning revealed that his decision was based on bias and extrajudicial knowledge and that Johnson was therefore deprived of a fair hearing. We agree that some of the judge's questions were improper. However, because the record indicates that the judge remained a neutral arbiter and did not base his decision on information gained outside of judicial proceedings, we affirm.

## Background

In 2017, Johnson was placed on deferred adjudication community supervision for assault–family violence. *See* Tex. Penal Code Ann. § 22.01. His probation conditions required him to refrain from consuming any alcoholic beverages, from using controlled substances, and from committing any criminal offenses. He was also required to submit to drug testing as directed by his probation officer.

In February 2020, the State filed a petition to proceed to adjudication, alleging that Johnson had violated his probation terms by committing another family violence assault, by consuming alcohol, by failing to provide a urine sample for drug testing, by failing multiple drug tests, and by falsifying a drug test. In January 2021, the State filed

an amended petition to proceed to adjudication in which it alleged an additional positive drug test that occurred after it had filed its prior petition. In April 2021, the State filed a second amended petition to proceed to adjudication, alleging that since the filing of its prior petition, Johnson had experienced another positive drug test result and had again consumed alcohol. In May 2021, the State filed its third amended petition to proceed to adjudication, alleging that since its prior petition, Johnson had yet another positive drug test.

At the hearing on the petition, Johnson pled not true to the family violence allegation, but he pled true to the other allegations. Each side then presented witnesses. The State's witnesses included Johnson's probation officer; Johnson's former girlfriend, now wife, C.F.,[1] against whom Johnson had allegedly committed the new assault offense; and the officer who responded to C.F.'s 911 call reporting the alleged assault. Johnson's witnesses included his mother; his sister; Daryl Reynolds, the grandfather of his child; and Heather Singer, a licensed professional counselor and licensed chemical dependency counselor.

Johnson's probation officer testified that Johnson was not a good candidate to remain on probation due to his continuous probation violations. During C.F.'s testimony, she denied that Johnson had ever hit her. Singer testified that she had diagnosed Johnson with PTSD, that he used substances to cope with his trauma, and

---

[1]Because this case involves allegations of family violence, we use initials to protect C.F.'s privacy.

that in her opinion, if he "g[o]t help with this trauma," it would help with his substance abuse. She testified that if the judge allowed Johnson to remain on probation, she would be willing to work with him.

The trial judge questioned the probation officer, C.F., and each of Johnson's witnesses. Johnson did not object to any of the judge's questions. We discuss the questioning of C.F., Singer, and Johnson's son's grandfather in more detail below.

At the conclusion of the hearing, the trial judge decided not to continue Johnson's probation and proceeded to adjudication. However, the judge did not find the assault allegation true. He stated,

> All right. Well, I don't know what to believe as to paragraph one. My gut instinct tells me that the assault happened. But because of Ms. [C.F.]'s derelict testimony, it makes that case pretty much unprosecutable, so I'm going to find paragraph one not true.
>
> However, based upon your pleas of true to paragraphs two, three, four, five[,] and six, I'll find paragraphs two, three, four, five[,] and six true. I'll find you violated your probation, Mr. Johnson, and I'll find you guilty of the offense of assault on a family or household member with a previous conviction.
>
> The problem here is I note in the record that the first petition [to proceed to adjudication], the very first petition was filed February of 2020. Subsequent to that, Mr. Johnson had five UAs and was arrested for two offenses.[2] Clearly, nobody, and that possibly includes—that includes everybody in this case—was not getting the message that this was serious.
>
> I'm not going to sentence you to ten years but—but clearly this probation didn't really mean a whole lot to you, Mr. Johnson.

---

[2]Johnson was arrested for submitting the false drug test.

4

So having found you guilty of this offense, I'll sentence you to six years confinement in the institutional division.

Johnson now appeals.

**Discussion**

In his sole point, Johnson asserts that the trial judge "fundamentally erred in adversarial cross-examination of defense witnesses that introduced inadmissible evidence and reflected personal bias negating neutral and detached judgement." He specifically complains of the questioning of Reynolds, C.F., and Singer. Johnson thus argues that his complaint falls into one of the *Marin* categories of complaints for which no objection is necessary to preserve error. *See Proenza v. State*, 541 S.W.3d 786, 794 (Tex. Crim. App. 2017) (reiterating its rejection of common law "fundamental error" exception to error preservation but stating that "fundamental error" complaint may also be simply a reference to categories of error discussed in *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 1993), for which no objection is needed). Regardless of whether Johnson's issue is one that he could not forfeit by inaction, Johnson's issue fails on the merits. *See Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020) (stating that the appellant's bias arguments failed on the merits and not addressing appellant's assertion that judge's conduct was fundamental error not requiring objection), *cert. denied*, 142 S. Ct. 436 (2021); *Brumit v. State*, 206 S.W.3d 639, 644–45 (Tex. Crim. App. 2006) (declining to decide whether objection was required for bias argument because record did not reflect partiality of the trial court); *Dunbar v.*

*State*, Nos. 03-18-00673-CR, 03-18-00674-CR, 2020 WL 1943356, at *2 (Tex. App.—Austin Apr. 23, 2020, no pet.) (mem. op., not designated for publication) (assuming without deciding that trial judge's comments in probation revocation proceeding were error for which no objection was required).

## I. Applicable Law

Although a trial judge may question a witness to obtain information or clarify a point, the judge must not become "an advocate in the adversarial process and los[e] the neutral and detached role required for the fact finder and the judge." *Moreno v. State*, 900 S.W.2d 357, 359 (Tex. App.—Texarkana 1995, no pet.); *see Hamlett v. State*, Nos. 05-19-00552-CR, 05-19-00553-CR, 05-19-00554-CR, 2020 WL 4047968, at *2 (Tex. App.—Dallas July 20, 2020, no pet.) (mem. op., not designated for publication) (stating that, although not favored, extensive and adversarial questioning is permissible in a bench trial but the questions must be relevant to the issues before the court and the court's impartiality must not be affected). To determine whether a judge's bias or prejudice denied the defendant due process, we review the entire record. *Tovar v. State*, 619 S.W.3d 783, 792 (Tex. App.—San Antonio 2020, pet. ref'd). Unfavorable rulings alone will not support a claim of bias, and generally, neither will remarks of a judge during the course of a trial "that are critical or disapproving of, or even hostile to counsel, the parties, or their cases." *Trung The Luu v. State*, 440 S.W.3d 123, 129 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Avilez v. State*, 333 S.W.3d 661, 675 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). Further, "opinions based

6

upon evidence received in judicial proceedings do not ordinarily raise questions about impartiality." *Quinn v. State*, 958 S.W.2d 395, 403 (Tex. Crim. App. 1997). Rather, bias is shown by a disposition or opinion that is "'*wrongful or inappropriate* . . . because it is undeserved, or because it rests upon knowledge that the [judge] ought not to possess . . . , or because it is excessive in degree.'" *Abdygapparova v. State*, 243 S.W.3d 191, 198 (Tex. App.—San Antonio 2007, pet. ref'd) (discussing judge recusal and quoting *Liteky v. United States*, 510 U.S. 540, 550, 114 S. Ct. 1147, 1155 (1994)). "Absent a clear showing of bias, a trial court's actions will be presumed to have been correct." *Brumit*, 206 S.W.3d at 645; *cf. Calvert v. State*, No. AP-77,063, 2019 WL 5057268, at *25 (Tex. Crim. App. Oct. 9, 2019) (not designated for publication) (stating that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings" cannot support a motion to recuse on the basis of bias or partiality "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible" (quoting *Liteky*, 510 U.S. at 555)).

## II. The judge's questioning of Reynolds

We begin with the judge's questioning of Johnson's son's grandfather, Daryl Reynolds. Johnson's only complaint about the judge's questioning of this witness was the judge's "adversarial tone." We conclude that the judge's questioning was not improper.

7

Reynolds testified about Johnson's trouble with substance abuse and their conversations about it, and he stated that "as far as [he] could see, [Johnson has] gotten better." He could not say whether Johnson needed additional help for his drug problem. On cross-examination, the prosecutor asked Reynolds about his familiarity with Johnson's criminal history. Reynolds knew about most of the incidents but did not know that Johnson had been convicted of two robbery counts in 2002. The prosecutor then questioned Reynolds's knowledge about Johnson's drug use, and Reynolds revealed that he had not known the full extent of it. He stated that he could not say whether he was surprised to learn that Johnson "had 30 different violations for drugs while on probation"; that he was not aware before trial of quite how often Johnson used drugs; and that he learned for the first time on the day of trial that in addition to marijuana, Johnson had tested positive for cocaine and ecstasy. On redirect, Reynolds testified that he would help Johnson if his probation were continued: "When he's on probation, going forward, Your Honor, I'm going to take a different active role in his life because I think he is worth it."

The judge then asked Reynolds questions seeking clarification and elaboration of the above testimony.

> THE COURT: Did you know the defendant was on probation from April 11th, 2017, in this case?
>
> THE WITNESS: Yes, sir.
>
> THE COURT: Did you have an active role in his life at that time?

8

THE WITNESS: Yes, I did.

THE COURT: But you didn't know the extent of his drug use, correct?

THE WITNESS: Exactly. Yes, sir.

THE COURT: You knew the conditions that were going to be imposed upon him as a part of his probation?

THE WITNESS: Yes. And I guess my thinking was he was acting accordingly.

THE COURT: What does that mean?

THE WITNESS: Doing what—what he needed to do.

THE COURT: Now you know he really wasn't, right?

THE WITNESS: Being on it, taking ownership, and then moving forward to try to develop a better—being a better person. . . .

. . . .

THE COURT: So you . . . understand that [Johnson] has been charged and indicted for the offense of assault on a family or household member with a previous conviction, correct?

THE WITNESS: Yes.

. . . .

THE COURT: Okay. Did you talk to the defendant about what happened on that occasion?

THE WITNESS: No.

THE COURT: Didn't have any conversation at all with him about it?

THE WITNESS: Yes, I had just basic communication where, you know, he said he just lost—lost it for a moment. And we didn't expound

9

on it, but I said, "Hey, you know, she's—she's a queen and should be treated accordingly," because that's how I look at my ladies, you know, or lady.

. . . .

THE COURT: Okay. You testified that if this court puts him back on probation, you're going to be taking a different active role in his life.

Why has that not happened before now, Mr. Reynolds?

THE WITNESS: I'm retired now. I have a lot more free time.

THE COURT: Okay.

. . . .

THE COURT: So let me ask you this. So assume we put him on—back on probation. I'm not saying I'm going to do that, but assume we do and, you know, he messes up again. Not—maybe not six—in six paragraphs with one, two, three, four, five, six, seven, eight, nine, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20 separate violations, but one or two. What do you think we should do then?

THE WITNESS: I think we can look at him on a 24-hour basis from day to day. And the reason why I say that is because I smoked cigarettes for 37 years of my life.

THE COURT: Hard to give up, isn't it?

THE WITNESS: I quit cold turkey on December 9th, 2009 and haven't looked back. And I did it on a 24-hour to 24-hour basis with the help of God.

THE COURT: I believe you.

THE WITNESS: My brother and I recently had conversations regarding God and how we work our way from the top down, and he made his confessions. He made his peace with God. I believe him, and I think he's worth working with.

THE COURT: But don't you think the time to have that conversation, to get right with God, is when you plead guilty and you're looking at two to ten years in the pen and not after you get the State's Third Amended Petition?

I mean, back to my original question, a hypothetical. If I put him back on probation and all of a sudden three, four, five months from now, we're back in the courtroom with another violation, what are you going to expect this court to do then?

THE WITNESS: I don't have any control over that situation, sir, at all. I'm not trying to say that he will, or he won't. All I'm trying to say is that I think he deserves an opportunity because of what we've been through recently and the conversations that we've been through recently and the back and forth of him taking care of his son, picking his son up.

And I ask—I asked him to take a more active role in his son's life and go to school functions and things of that nature. And you know what he did? He did just that.

In context, the trial judge's questioning was an attempt at eliciting clarification and elaboration. Because Johnson pled true to the drug-related violations, the only decision the judge had to make regarding those violations was whether circumstances merited his continuing Johnson's probation despite the violations. The judge's questioning of Reynolds—like his questioning of Johnson's mother and sister, about which Johnson does not complain—was an attempt to elicit information relevant to that decision. His questions related to whether Reynolds's testimony was based on accurate knowledge about Johnson and the alleged probation violations, to why Reynolds believed he could help Johnson comply with probation conditions when he did not do so in the past, and to whether Reynolds's testimony reflected a true belief that Johnson would behave differently if allowed to stay on probation. In other

11

words, the questioning showed the judge was "seeking facts for his fact-finding role." *Moreno*, 900 S.W.2d at 359. The questioning of Reynolds did not demonstrate that the trial judge had lost his ability to remain neutral and detached. *See id.*; *Hamlett*, 2020 WL 4047968, at *5.

### III.  The judge's questioning of C.F.

Johnson complains that the judge's questioning of C.F., the alleged victim of Johnson's assault, was "particularly adversarial" and "went beyond mere clarification and into the realm of advocacy." In C.F.'s testimony, she acknowledged that she had called 911 on the night that Johnson had allegedly hit her, but she testified that her statements to law enforcement that night were untrue. She attempted to discredit her own prior statements by saying that she was "hysterical" at the time of the call because she had been drinking and believed that Johnson had been cheating on her with a woman who had been harassing her. When asked if she told officers that Johnson had punched her in the face or that she slept with a knife under her pillow out of fear of Johnson, she stated that she could not remember. She did acknowledge, however, telling officers that she had grabbed a knife and locked herself in the bathroom to protect herself from Johnson.

On cross-examination, Johnson's attorney revisited C.F.'s testimony that she had lied to police because of her emotional state:

> Q. [In the 911 call,] we heard your state. You're hysterical you just stated?

12

A. Yes, I was.

Q. What were you really mad about?

A. Because of this [other woman] and all this infidelity, and I was mad. I was wrong. I was completely wrong. I mean, [Johnson] did not hit me.

. . . .

Q. And you say, "I'm so tired of this man hitting me."

Has he ever hit you during your relationship?

A. He's never hit me, no.

. . . .

Q. Okay. Why did you tell the police that you're tired—or the 911 operator that you're tired of this man hitting you?

A. I mean, I can't tell you why I was mad, hysterical. I was—I can't say why. I mean, I can't—I'm just telling the truth now. I can't say why, but I do regret that I did that. I wasn't thinking. I was just hysterical, mad, everything was going on. . . .

. . . .

Q. So what you're saying is that you are telling the truth now on the record; is that correct?

A. Yes, ma'am.

She denied that her face was swollen the day of the alleged assault due to being hit, stating that it was either the result of her crying or her having lupus. She acknowledged that at the time of the incident she told police officers that Johnson had slapped her. She further admitted that she provided a written statement stating that Johnson had slapped and punched her.

13

The judge's questions of C.F. pertained to the plausibility of C.F.'s trial testimony that her previous statements were lies resulting from her hysterical state:

THE COURT: You heard the 911 call for the first time today?

THE WITNESS: Yes.

THE COURT: You agree you're upset on that 911 call?

THE WITNESS: I am.

THE COURT: Hysterical?

THE WITNESS: Yes, sir.

THE COURT: Are you characteristically hysterical?

THE WITNESS: Explain that to me.

THE COURT: You get hysterical a lot?

THE WITNESS: Yeah.

THE COURT: Really? How often?

THE WITNESS: I mean, when things are going on, I do.

THE COURT: No, no. I mean, on a regular basis, do you get hysterical about things every day?

THE WITNESS: Oh, no. No.

THE COURT: Do you regularly call 911 everyday?

THE WITNESS: No.

THE COURT: Only when something is going on, right?

THE WITNESS: Yes.

THE COURT: Clearly this was an upsetting event.

THE WITNESS: Correct.

. . . .

THE COURT: So—and you said, "I'm getting hit on."

You heard that on the 911 call, correct?

THE WITNESS: Yes, sir.

THE COURT: "I'm tired of getting hit on."

You didn't just say it once, you said it twice, didn't you?

THE WITNESS: Yes, sir.

THE COURT: So your testimony here today—did you—your testimony is he didn't lay a hand on you, right?

THE WITNESS: No, he didn't hit me.

. . . .

THE COURT: And so you would have felt safe with him, right, physically?

THE WITNESS: Physically, yes.

THE COURT: Okay. So your testimony here today is that despite your 911 call, despite your being hysterical on the 911 call, despite your saying that "I'm tired of him hitting me" two times on the 911 call, you still would have felt physically safe with the defendant; is that right?

THE WITNESS: Yes, sir.

THE COURT: So safe that you slept with a knife under your pillow; is that right?

THE WITNESS: I didn't sleep with a knife under my pillow.

THE COURT: So safe you had a knife with you?

15

THE WITNESS: I had a knife because I was mad. I was mad, and that [other woman] was driving by my house, too, sir.

THE COURT: You felt—you had a knife when you were calling 911, correct?

THE WITNESS: Correct.

THE COURT: Okay. You heard testimony that—regarding your telling the officer that he hit you.

You heard that, right?

THE WITNESS: Yes.

THE COURT: So if the officer said he hit you—if the officer said you told the officer he hit you, is that officer lying about that?

THE WITNESS: I mean, no, I'm not going to say he's lying, that I didn't tell him that. No, I'm not going to say that.

The judge then allowed each side to ask further questions, but only Johnson's attorney took him up on the offer. In that questioning, C.F. reiterated that she called 911 because she was "[r]eally, really mad" and that when she "get[s] really, really mad," she becomes hysterical. As noted above, in announcing his ruling to proceed to adjudication, the judge stated that his gut feeling was that "the assault happened," but in light of C.F.'s testimony, he was finding the assault allegation not true. In other words, whatever the judge's attitude toward C.F. or the tone of his questioning, he found in Johnson's favor on this allegation.

Although we cannot hear a judge's tone from a cold record, even a transcript can sometimes reveal a judge's questioning to be nothing more than an attempt to belittle or embarrass a witness rather than a sincere attempt at clarifying testimony.

16

*See, e.g., In re A.T.M.*, No. 13-21-00008-CV, 2021 WL 2584402, at *19 (Tex. App.—Corpus Christi–Edinburg June 24, 2021, no pet.) (mem. op.). In this case, however, C.F. was indisputably lying in either her hearing testimony or in her interactions with the 911 dispatcher and police officers on the night in question, and it fell to the judge to determine what version of her story was more credible. The judge was within the permissible bounds of his discretion in probing C.F.'s testimony to determine which version of her story was true. The wording of some of the questions may have displayed some degree of impatience or incredulity toward C.F., but the record does not show the judge to be so antagonistic as to make fair judgment impossible. *See Liteky*, 510 U.S. at 555, 114 S. Ct. at 1157; *Hamlett*, 2020 WL 4047968, at *2–3; *Odemwingie v. State*, No. 05-18-01491-CR, 2020 WL 1303279, at *3 (Tex. App.—Dallas Mar. 19, 2020, no pet.) (mem. op., not designated for publication) (stating that "[a]lthough the record demonstrates the trial judge was frustrated by appellant's apparent lack of candor," her questions did not demonstrate an inability to render a fair judgment); *cf. Song v. Kang*, No. 02-18-00375-CV, 2020 WL 1808487, at *8 (Tex. App.—Fort Worth Apr. 9, 2020, pet. denied) (mem. op.) (noting that "[i]mpartiality is not gullibility") (quoting *Liteky*, 510 U.S. at 551, 114 S. Ct. at 1155).

## IV. The judge's questioning of Singer

The judge's questioning of Singer, Johnson's counselor, included questions about her practice history and her interview with Johnson. Singer had been asked by the prosecutor about the timing of Johnson's visit to her—he saw her one month

after the State filed its third amended petition and one month before the hearing—and she testified that she had no way of knowing what motivated him to see her when he did or why he waited two years after his first probation violation to see her. She further stated that in deciding whether Johnson was a good candidate for treatment, she had not considered the timing of his visit.

The judge then asked Singer questions suggesting that he was interested in what had prompted Johnson's visit to Singer. He asked Singer whether she had any probation department records indicating that Johnson had requested help with his substance abuse or whether he had told her that he had tried and failed to get help elsewhere before coming to see her. Singer stated that she had no such records and no memory of Johnson saying anything like that to her, and she confirmed that if he had said something like that, it would have been significant enough to note.

Toward the end of the judge's questions, however, he pivoted to asking Singer questions about herself, and his inquiries indicated that he may have had some pre-existing knowledge about her:

> THE COURT: Okay. How long were you with [her previous employer, Center for Therapeutic Change]?
>
> THE WITNESS: Four years.
>
> THE COURT: Okay. When did you start?
>
> THE WITNESS: Internship was 2015.
>
> THE COURT: Okay.

THE WITNESS: Then I left October 2019.

. . . .

THE COURT: Why did you leave CTC?

. . . .

THE WITNESS: I left, honestly, on my own to enter private practice.

THE COURT: Didn't have any disagreements with Kelly Bellamy or anything over anything?

THE WITNESS: Any disagreements?

We had a difference of opinion on some things, yes.

THE COURT: Oh. What was the difference of opinion?

THE WITNESS: Many treatment protocols.

THE COURT: Treatment protocols. Anything else?

THE WITNESS: It was treatment protocols.

THE COURT: Anything else?

THE WITNESS: It was literally treatment protocols.

THE COURT: Is that a no?

THE WITNESS: Yes, sir.

. . . .

THE COURT: Ms. Singer, you ever gone by Heather Alison Gwyn?

THE WITNESS: Yes, sir.

THE COURT: Have you ever been in Denton County?

THE WITNESS: Yes, sir.

THE COURT: Have you ever been in the 158th Judicial District Court?

THE WITNESS: Yes, sir.

THE COURT: Have you ever been convicted of a felony in this or any other state?

THE WITNESS: No, sir.

THE COURT: Have you ever been charged or indicted with a felony in this or any other state?

THE WITNESS: Yes.

THE COURT: Pass the witness.

Anybody else want to ask any questions?

[Johnson's attorney]: Yes, Judge.

THE COURT: [G]o ahead.

[Johnson's attorney:] What was the felony that you were charged with?

A. Possession of a controlled substance and driving under the influence—

Q. What was the—

A. —with a child.

Q. What was the controlled substance?

A. It was opiate, pain pill.

Q. Is it—what was the name brand for that?

A. Hydrocodone.

20

Q. And was that the substance that you were alleged to have been intoxicated by as well?

A. No. No. I had taken Phenergan.

Q. What is Phenergan?

A. Nausea medication.

Q. Okay. What were the dispositions of those cases?

A. How did they end?

Q. Uh-huh.

A. I completed all terms.

Q. Well, did you plead guilty to them?

A. I took deferred adjudication.

Q. Okay. On both?

A. Uh-huh.

Q. Do you believe that you have a substance abuse problem?

A. No, sir.

Q. Okay. Did you receive any help or treatment with those?

A. I did. Uh-huh.

The record does not reveal the source of the judge's information about Singer

(or the extent of it[3]) and thus does not indicate whether he gained that information in

---

[3]The judge's questions about prior arrests and Singer's reason for leaving CTC certainly imply that the judge had some kind of information on those topics that prompted his questions, but they do not establish exactly what he knew or believed he knew.

prior court proceedings. *See Liteky*, 510 U.S. at 555, 114 S. Ct. at 1157 (stating that opinions formed from facts introduced in prior proceedings do not establish bias "unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible"); *Goodman v. State*, Nos. 05-20-00172-CR, 05-20-00173-CR, 05-20-00174-CR, 05-20-00175-CR, 05-20-00176-CR, 2021 WL 3042675, at *3 (Tex. App.—Dallas July 19, 2021, no pet.) (mem. op., not designated for publication) (stating that "[a]n extrajudicial source is one arising outside the courtroom or the functioning of the court system"). However, assuming that he learned the information from an extrajudicial source, there is no indication in the record that the judge's knowledge about Singer or his attitude toward her affected his ruling. *See Liteky*, 510 U.S. at 556, 114 S. Ct. at 1158 (stating that the presence of an extrajudicial source does not necessarily establish bias); *Goodman*, 2021 WL 3042675, at *3 (stating that trial court's statements indicated that it had based its sentencing decision on defendant's failure to accept responsibility for his crime rather than on unproven factual assertions recited by the court); *Casas v. State*, 524 S.W.3d 921, 925 (Tex. App.—Fort Worth 2017, no pet.) (noting trial judge's statement that he based his ruling on testimony at the hearing and concluding that judge made his ruling not on an impermissible bias but on the admitted evidence); *cf. Kniatt v. State*, 239 S.W.3d 910, 920 (Tex. App.—Waco 2007, no pet.) (discussing judge recusal and stating that when a party alleges judge has personal knowledge of disputed facts, party must show the knowledge was wrongfully obtained or led to a wrongful case disposition); *Moreno*,

900 S.W.2d at 360 (holding that record did not reveal that the judge had become "so entangled as an advocate that he could not at the end of the proceeding make an objective finding of fact in the case").

The record does, however, indicate the contrary—that the judge did not base his ruling on extrajudicial knowledge about or bias against Singer. The judge stated that in deciding whether Johnson had violated his probation conditions, he had relied on Johnson's pleading true to the drug-related violations, and in deciding whether to continue probation in light of those violations, he had relied on Johnson's behavior during probation, which indicated to the judge that Johnson had not taken probation seriously. That is, the judge decided that Johnson's attitude toward probation did not merit continuing probation, whatever the ultimate cause of his behavior and regardless of whether treatment could help Johnson if he truly wanted that help. *See Goodman*, 2021 WL 3042675, at *3; *see also Flournoy v. State*, 589 S.W.2d 705, 708 (Tex. Crim. App. [Panel Op.] 1979) (holding that once sufficient evidence is presented of a violation of a community supervision condition, the trial court has broad discretion in choosing whether to continue, modify, or revoke the community supervision); *Brewer v. State*, No. 02-19-00382-CR, 2021 WL 924699, at *2 (Tex. App.—Fort Worth Mar. 11, 2021, no pet.) (mem. op., not designated for publication) ("When there is sufficient evidence to support a finding that the defendant violated a condition of his community supervision, the trial court does not abuse its discretion by revoking the supervision."). Essentially, the judge's decision turned on his evaluation of Johnson's

23

attitude toward probation and his illegal substance use, not on the judge's opinion of Singer—whether that opinion was based on extrajudicial information or not. The judge specifically pointed out that Johnson continued to commit drug-related violations even after the State first petitioned to proceed to adjudication. In fact, Johnson continued to commit drug-related violations after the State's first amended petition and after its second petition. The judge also had Johnson's probation officer's testimony that, due to Johnson's continuous probation violations, he should not be left on probation.[4] The judge could have reasonably decided that Johnson's last-minute consultation with Singer was not a credible indication that Johnson would behave differently going forward. The judge's questioning of Singer about Johnson's statements to her—asking whether Johnson told her he had ever sought and been denied help previously[5]—and his questioning of Reynolds also suggest that the judge, throughout the hearing, was attempting to determine whether Johnson had any intention of behaving differently or getting help if left on probation. Based on the

---

[4]Johnson argues that the probation department recommended continuing probation, suggesting that the trial court's ruling in the face of that recommendation must have been based on bias. Johnson refers to the probation department's recommendation in December 2019, before the State's first petition to proceed to adjudication. Regardless of any recommendations made earlier in Johnson's probation, by the time of the hearing, that recommendation had changed. Johnson's probation officer testified that, due to Johnson's continued violations, he was not a good candidate for continuing probation.

[5]Probation records admitted at the hearing show that Johnson had participated in a court-ordered drug treatment program and that he was discharged from the program at least once, due in part to his continued substance abuse.

evidence at the hearing, he could have decided the question against Johnson. *See Segovia v. State*, 543 S.W.3d 497, 504 (Tex. App.—Houston [14th Dist.] 2018, no pet.) (holding no bias shown when trial court's ruling was based on what trial court learned from participation in the case). Singer's testimony, on the other hand, focused on why Johnson abused illegal substances and what treatment could help him but did not attempt to explain why Johnson had not previously sought treatment from her or why he finally consulted her shortly before the hearing, and it therefore did not provide evidence on the issue that was the focus of the judge's inquiries.

However, the judge's questioning of Singer about her previous criminal history was improper. It introduced into the proceedings Singer's unadjudicated offense, which had no apparent relevance except to impeach her credibility. *But see* Tex. R. Evid. 609 (allowing use of *convictions* for witness impeachment). His questions were clearly outside the bounds of proper questioning. *Id.*; *cf. Moreno*, 900 S.W.2d at 359–60 (holding bias not shown when, among other factors, answers elicited by judge's questions were within the bounds of admissible testimony).

Nevertheless, the judge's questions did not reveal a bias on a disputed fact on which the judge's ruling was based. *Cf. Casas*, 524 S.W.3d at 925 (concluding that no bias was shown in case where an issue was the speed limit where defendant had been driving, and the judge stated that he knew where the police officer who stopped the defendant had been sitting, but judge's other statements indicated he had based his ruling on the evidence before him). In light of the record, the judge's questioning of

Singer was basically the equivalent of the improper admission of evidence on which a ruling is not based. *See Celis v. State*, 354 S.W.3d 7, 24 (Tex. App.—Corpus Christi–Edinburg 2011) (stating that judge's evidentiary rulings do not suffice to show bias), *aff'd*, 416 S.W.3d 419 (Tex. Crim. App. 2013); *see also Santschi v. State*, No. 14-15-00771-CR, 2017 WL 3090001, at *4 (Tex. App.—Houston [14th Dist.] July 20, 2017, no pet.) (mem. op., not designated for publication) (same). Because the record does not indicate that the judge based his decision to proceed to adjudication on extrajudicial knowledge about a disputed fact or that the judge had lost his ability to be a neutral arbiter, we overrule Johnson's sole point.

## Conclusion

Having overruled Johnson's point, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: June 30, 2022