

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00104-CR

_____

TYRONE DESHONE COLEMAN, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1715314

Before Kerr, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant Tyrone Deshone Coleman was convicted by a jury of aggravated robbery and aggravated assault with a deadly weapon and sentenced to imprisonment for life and twenty-five years' respectively. In five issues on appeal, Coleman argues that the jury charge was improper, the trial court erroneously released juror information, the trial court was biased, the trial court erred in refusing to allow him to respond to State objections, and the trial court erred by refusing to include an instruction for the lesser-included-offense of assault causing bodily injury. We will affirm.

## I. BACKGROUND

### A. TRIAL TESTIMONY

Britney Mandrell testified at trial that on August 26, 2021, she met Coleman at a convenience store and the two left together in his car. Coleman drove to a warehouse parking lot and asked Mandrell to engage in sex acts with him. Mandrell refused and both exited the car. Mandrell told Coleman that she was going to walk back to her car at the convenience store, so he got back into his driver's seat. At this point, Mandrell realized that she had left her money and cell phone in the passenger seat, so she tried to open the door to retrieve the items. However, Coleman locked the car doors. She then asked Coleman if she could collect her items and reached into the open window to get them. At that point, Coleman rolled the window up, pinning her arm inside the car.

Coleman then quickly accelerated forward and started swerving the car with Mandrell still hanging in the window. Mandrell held on briefly, then the window opened slightly and she fell to the ground and landed on her side. She testified that the car then ran over her arm and the fatty portion of her abdomen. A passerby drove Mandrell to her grandmother's house. After Mandrell arrived there, her brother called 9-1-1, and paramedics responded and transported her to the hospital. She spent about a week and a half in the hospital to treat her severe abrasions and bruising.

Dr. Jelani Ingram testified as an expert for the defense. In his opinion, Mandrell's medical records did not support the claim that her arm had been pinned inside the window of Coleman's car as it moved quickly forward because in that scenario, Dr. Ingram would have expected her to have suffered a shoulder injury, which she did not have. Similarly, he testified that, if her arm and stomach had in fact been run over, he would have expected her to have suffered a broken arm, pelvic injuries, and internal bleeding, which she did not. Finally, he testified that Mandrell's injuries did not constitute serious bodily injury.

## B. PROCEDURAL FACTS

The State charged Coleman with aggravated robbery and aggravated assault with a deadly weapon. The aggravated-robbery count in the indictment alleged that Coleman

while in the course of committing theft of property and with intent to obtain or maintain control of said property . . . did intentionally or knowingly cause bodily injury to another, Britney Mandrell, by trapping [her] arm by rolling up the window of his automobile, or driving his automobile while [she] was being dragged, or running over [her] with his automobile, and [he] used a deadly weapon, namely, an automobile.

The jury charge instructed that a person commits robbery if "in the course of committing theft" he "intentionally, knowingly[,] or recklessly causes bodily injury to another." It then instructed that "a person commits the offense of aggravated robbery if he commits the offense of robbery as defined above and he uses or exhibits a deadly weapon." The application paragraph then stated that the jury should find Coleman guilty of aggravated robbery if it found beyond a reasonable doubt that he

intentionally, knowingly[,] or recklessly, while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause[d] bodily injury to another, Britney Mandrell, by trapping [her] arm . . . by rolling up the window of his automobile, or driving his automobile while [she] was being dragged, or running over [her] with his automobile, and [Coleman] used or exhibited a deadly weapon, namely an automobile. . . .

Coleman objected to this charged language and argued that the jury should be instructed that the State was required to prove "serious bodily injury." The trial court overruled this objection.

The indictment count charging aggravated assault with a deadly weapon alleged that Coleman

[d]id intentionally or knowingly cause bodily injury to Britney Mandrell by trapping [her arm] by rolling up the window of his automobile, or driving his automobile while [she] was being dragged, or running over

4

[her] with his automobile, and [he] did use or exhibit a deadly weapon, namely, an automobile.

Coleman requested the inclusion in the jury charge of an instruction for the offense of assault causing bodily injury as a lesser-included to his aggravated assault charge. The trial court denied this request.

The jury convicted Coleman of both offenses. After trial, the State filed an unverified motion for release of juror information, reasoning that "[g]ood cause exist[ed] for the request of this information, in that the state intend[ed] to use this information for the legitimate purpose of sending out jury letters to inform jurors of possible post-trial remedies and their rights concerning those remedies." The trial court granted the motion.

## II. DISCUSSION

### A. JURY CHARGE

In his first issue, Coleman argues that the trial court erred by instructing the jury that he could be found guilty of aggravated robbery by either finding that he caused bodily injury to Mandrell or by finding that he used a deadly weapon. A correct jury charge, says Coleman, would have instructed the jury that he was guilty upon a finding of *serious* bodily injury or the use of a deadly weapon. We will overrule this issue because there was no error in this instruction.

5

## 1. Standard of Review and Relevant Law

We must review all alleged jury-charge error regardless of preservation in the trial court. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred; if not, our analysis ends. *Id.*

A jury charge's purpose is to inform the jury of the law applicable to the case and to guide them in its application. *Beltran De La Torre v. State*, 583 S.W.3d 613, 617 (Tex. Crim. App. 2019). A trial court has a duty to instruct the jury on the law applicable to the case regardless of any objection to the charge by the defendant. *Vega v. State*, 394 S.W.3d 514, 519 (Tex. Crim. App. 2013); *see* Tex. Code Crim. Proc. Ann. art. 36.14. The trial court is ultimately responsible for the accuracy of the jury charge and the accompanying instructions. *Vega*, 394 S.W.3d at 518.

Section 29.03 of the Texas Penal Code provides that a person commits the offense of aggravated robbery if he commits robbery as defined by Section 29.02 and "(1) causes serious bodily injury to another; (2) uses or exhibits a deadly weapon; *or* (3) causes [or threatens to cause] bodily injury [to an elderly or disabled person]." Tex. Penal Code Ann. § 29.03(a) (emphasis added). A person can be convicted of aggravated robbery upon a finding that he committed robbery and only one of these three aggravating factors. *See Landrian v. State*, 268 S.W.3d 532, 539 (Tex. Crim. App. 2008); *Woodard v. State*, 294 S.W.3d 605, 609 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd). Under Section 29.02, a person commits robbery if, in the course of committing a theft "and with intent to obtain or maintain control of the property, he[]

6

intentionally, knowingly, or recklessly causes bodily injury to another" or threatens or causes another person to fear imminent bodily injury or death. Tex. Penal Code Ann. § 29.02(a).

## 2. Analysis

In the indictment, the State charged Coleman with aggravated robbery, alleging that he (1) committed a theft, (2) caused Mandrell bodily injury in one of three possible ways, *and* (3) used an automobile as a deadly weapon. Thus, the State's theory of the case was that Coleman was guilty of only the deadly-weapon aggravating factor from Section 29.03(a).

The jury charge tracked the indictment and correctly instructed the jury that Coleman should be convicted if he, "while in the course of committing theft of property and with intent to obtain or maintain control of said property, cause[d] bodily injury" to Mandrell by trapping her arm in his automobile window, "or" driving his automobile while she was being dragged, "or" running over her with his automobile, "*and*" he "used or exhibited a deadly weapon, namely an automobile." [Emphasis added.]

Coleman contends that this instruction allowed the jury to convict him of aggravated robbery by finding only that he caused bodily injury (rather than *serious* bodily injury) to Mandrell. A plain reading of the charge belies this interpretation. The charge—by its use of the "and" emphasized above—clearly required that the jury find both that he caused Mandrell bodily injury (in one of three ways) and that he

7

used his automobile as a deadly weapon. Causing bodily injury is, of course, an element of the offense of robbery under Section 29.02(a), which the State was also required to prove as one of the elements of aggravated robbery. *See id.* §§ 29.02(a), 29.03(a). Thus, the charge did not need to also include a serious-bodily-injury instruction because the State did not allege that as one of the aggravating factors in this case. *See Landrian*, 268 S.W.3d at 539.

For these reasons, we hold that there was no error in the jury charge and overrule Coleman's first issue.

### B. REQUEST TO RELEASE JUROR INFORMATION

In his second issue, Coleman contends that the trial court erred by granting the State's motion to release personal juror information and that this error was harmful. The State concedes that the trial court erred by granting the motion but argues that there was no harm to Coleman because the verdict was not affected. We agree with the State.

Texas Code of Criminal Procedure Article 35.29(b) provides, in pertinent part, that upon application of a party "to the court for the disclosure of [certain juror information], the court shall, on a showing of good cause, permit disclosure of the information sought." Tex. Code Crim. Proc. Ann. art. 35.29(b); *see Hooker v. State*, 932 S.W.2d 712, 716 (Tex. App.—Beaumont 1996, no pet.) (observing that a showing of "good cause" generally must be based upon sworn testimony or other sufficient supportive evidence in the record). Because such personal information may only be

disclosed upon a showing of good cause, we review a trial court's ruling granting access to jurors' personal information under an abuse of discretion standard. *See Romero v. State*, 396 S.W.3d 136, 153 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

The State's motion is unverified and stated that it had good cause to release juror information because it "intend[ed] to use this information for the legitimate purpose of sending out jury letters to inform jurors of possible post-trial remedies and their rights concerning those remedies." We have held on a number of occasions that nearly-identical motions were insufficient to meet the State's burden of showing good cause under Article 35.29(b) and that a trial court abused its discretion in granting them. *See Brown v. State*, No. 02-22-00190-CR, 2023 WL 4779490, at \*9 (Tex. App.—Fort Worth July 27, 2023, no pet.) (mem. op., not designated for publication); *Johnson v. State*, No. 02-19-00194-CR, 2020 WL 1057309, at \*6 (Tex. App.—Fort Worth Mar. 5, 2020, no pet.) (mem. op., not designated for publication); *Onick v. State*, No. 02-18-00356-CR, 2019 WL 1950063, at \*6 (Tex. App.—Fort Worth May 2, 2019, no pet.) (mem. op., not designated for publication). Accordingly, we hold that the trial court erred by granting the State's inadequate motion to release juror information.

However, because this error was nonconstitutional, we can reverse the trial court's judgment only upon a showing that the error affected Coleman's substantial rights. *See* Tex. R. App. P. 44.2(b); *Johnson*, 2020 WL 1057309, at \*7. An error that has a "substantial and injurious effect or influence in determining the jury's verdict"

9

affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005);

*King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). Conversely, an error does

not affect a substantial right if we have "fair assurance that the error did not influence

the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim.

App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

Coleman contends that the harm here is the same as that argued by the

appellant in *Johnson*, namely that the State's motion "intrudes on [his] habeas counsel's

ability to communicate with the jurors in the few allowable instances when a juror can

testify (such as outside influences on the jury)." *Johnson*, 2020 WL 1057309, at *7.

Unfortunately for Coleman, we were not persuaded by this argument in *Johnson*, and

we remain convinced by *Johnson*'s reasoning:

> In the first place, [this argument] address[es] entirely speculative harm in
> the future. But even more importantly, [it] do[es] not advance an
> appropriate harm analysis. As noted above, in determining whether a
> nonconstitutional error affected a defendant's substantial rights, we look
> to whether the error had a substantial and injurious effect or influence in
> determining the jury's verdict. *See Haley*, 173 S.W.3d at 518; *King*,
> 953 S.W.2d 266 at 271. Thus, Johnson's theory that the trial court's
> error here could possibly have a negative impact on a future habeas writ
> that he may (or may not) file misses the mark.

*Id.*

Because the harm cited by Coleman is speculative and because the error

occurred after the trial had ended, we hold that the trial court's granting of the State's

motion to release juror information did not influence the jury's verdict in this case.

*See id.* We overrule Coleman's second issue.

## C. TRIAL COURT'S IMPARTIALITY

In his third issue, Coleman argues that the trial court reversibly erred by acting as "an advocate for the State and abandon[ing] its role as a neutral arbiter." He posits that the entire record shows bias against him and points to five specific areas of the trial as indicative of the trial court's partiality: (1) its inequity in ruling on objections; (2) its scheduling rulings; (3) its finding his counsel in contempt; (4) its general demeanor; and (5) its ruling not to allow a *Daubert* hearing with the State's paramedic witness.

### 1. Additional Procedural Facts

Numerous contentious exchanges occurred at trial between defense counsel,[1] the prosecutor, and the trial court, and the trial court repeatedly admonished defense counsel regarding their courtroom behavior. Among other things, defense counsel repeatedly spoke over the trial court and the prosecutor despite requests not to do so,[2] called the prosecutor dishonest within the jury's hearing,[3] called the prosecutor

---

[1]Coleman was represented at trial by two attorneys. When necessary for the sake of clarity, we will refer to them as Counselor 1 and Counselor 2.

[2]On one occasion, the parties argued about whether a piece of evidence had been altered. The trial court asked Counselor 2 to stop talking and to "step outside into the hallway" because he was being "disruptive to [the] court." Counselor 2 apologized to the trial court, and the prosecutor began her argument. Then Counselor 1 interrupted the prosecutor, and the trial court had to ask Counselor 1 to stop talking seven times before he would allow the prosecutor to finish her argument.

[3]Also during the discussion about altered evidence, Counselor 2 stated that the State was being dishonest. After excusing the jury from the courtroom, the trial court

11

"baby,"[4] ignored the trial court's orders to sit while questioning witnesses or after obtaining an unfavorable ruling on an objection,[5] and responded angrily in open court.[6]

One particular exchange involved defense counsel's right to "perfect the record" after the judge ruled on a State's objection. During that exchange, the State objected to a defense question as "asked and answered," which the trial court sustained. The following conversation then occurred:

[Counselor 1]: Your Honor, just to perfect the record and clarify - -

The Court: And we'll do this - -

[Counselor 1]: Your Honor - -

---

stated, "So why don't we just state for the record that [Counselor 2] has called opposing counsel dishonest repeatedly in the [] clear hearing of the jury. He has made no attempt to whisper or to disguise his voice." Counselor 2 was then ordered to stop using the word "dishonest" in front of the jury.

[4]During one sidebar discussion, Counselor 2 said to the prosecutor, "Please get your finger out of my face, baby, please." After the trial court asked Counselor 2 to "try to act appropriately," he responded, "She put her finger in my face. If I would do that, you would have taken me to jail."

[5]The trial court had ordered both defense counsel and the State to sit while questioning witnesses.

[6]One such occasion occurred (with the jury absent) when Counselor 2 loudly slammed his laptop closed. When the trial court asked him to refrain from doing this, Counselor 2 apologized and stated that he had become "excited" due to what he perceived as the State being dishonest. The trial court responded that Counselor 2 needed to rein in his excitement so that "it d[id] not overcome [his] professionalism" because such behavior had "been a continuing issue throughout trial." Counselor 2 disagreed that his behavior had been an issue.

12

The Court: We will do this - -

[Counselor 1]: - - I - -

The Court: Come close - -

[Counselor 1]: You're going to cut me off and I'm not even - -

The Court: Yes.

[Counselor 1]: - - able to talk.

The Court: Come closer. Yes. Come up here.

[Counselor 1]: Can I - -

The Court: Approach the bench. Approach the bench, sir. Right now.

(At the bench, on the record)

[Counselor 1]: - - cut me off when you're talking, but you still continuously cut me off when I'm talking.

The Court: When you want to perfect the record, that's outside the presence of the jury.

[Counselor 1]: A response to that objection - -

The Court: Outside the presence of the jury.

[Counselor 1]: Am I not able to respond to their objection right when they make it?

The Court: No, you can't. If I've ruled, then you cannot. You can do it outside - -

[Counselor 1]: So just to make sure - -

The Reporter: I'm sorry. One at a time, please, sir.

[Counselor 1]:  Just to make sure, you're not going to allow us to respond to their objection.

The Court:  If I have ruled, then no.  If I need a response, I'll ask you.

[Counselor 1]:  But you will allow us to perfect the record?

The Court:  On the break.

Later, defense counsel and the trial court again took up the issue of the defense's "perfecting the record" outside the presence of the jury.  The trial court explained that, due to defense counsel's "outbursts" and disruptive behavior, it had ordered the parties to make short legal objections and responses without adding factual arguments (or reading entire rules from the Rules of Evidence) in an effort to conduct the trial in an "orderly and expeditious manner."

Another time, while defense counsel was conducting a cross-examination, the State made three objections to a single question, which the trial court sustained without clarifying the specific objection sustained.  Counselor 1 asked which objection had been sustained, and the trial court told him to move on with his questioning.  Counselor 1 asked again if he could know specifically which objection had been sustained, and the trial court responded, "No, you may not.  Have a seat and ask your next question."

At another point in the trial, the State questioned a paramedic who had treated Mandrell's injuries.  When the State asked the paramedic to describe the "type of injuries" that he observed on Mandrell, defense counsel objected, arguing that the

14

paramedic had not been designated as an expert and was not a medical doctor; thus, he was "not qualified to testify to injuries." The trial court overruled this objection, and defense counsel immediately lodged the same objection three more times unsuccessfully and then requested to conduct a *Daubert* hearing with the paramedic to determine if he was qualified to give expert testimony. The trial court denied that request. Despite this, defense counsel continued to argue the same objection, and the trial court again overruled it.

Defense counsel also took issue with two of the trial court's scheduling decisions made during trial. On the morning of the trial's fourth day, defense counsel became aware that the trial court was planning to extend trial to a later hour than usual. Counselor 2 objected to trial proceeding past 7:00 that evening because he had to pick his child up by 7:00. In his view, the trial court's scheduling decision had been made without notice to the defense, thus showing that the trial court was not acting impartially. The trial court stated that it was "mindful" of his issue but that it was also "mindful of this trial and our timing issues." The record shows that trial recessed at 6:32 that night.

At lunchtime on the fourth day, the trial court announced on the record (with Coleman, his attorneys, the State, and the jury present) that there would be a lunch recess from 12:50 until 1:20. The jury was dismissed and the parties quickly took up another matter with the trial court, and then the trial court reiterated that court would be "on break until 1:20." The trial court went back onto the record at 1:21 and noted

15

that the State and Coleman were present in the courtroom, but not Coleman's attorneys. The trial court asked the bailiff to check the hallway and to text defense counsel in an attempt to locate them, with no success.

After a few minutes of waiting, the jury was brought into the courtroom and defense counsel appeared. The following exchange occurred:

[Counselor 1]: Your Honor, we would like to take something on the record outside the presence of the jury.

The Court: We'll do that on the break. Defense may proceed.

[Counselor 1]: Your Honor, our lunch is being delivered. We haven't even gotten to eat lunch yet.

The Court: Okay. Defense may proceed.

[Counselor 1]: Your Honor, may we approach?

The Court: You may not. We're going to finish this witness. You're in the middle of cross-examination. You may proceed.

[Counselor 2]: And you let other people eat in the middle of cross-examination, Your Honor. It takes ten minutes to get our food and ten minutes to get back in. We've never been given a 30-minute lunch break. Furthermore, we didn't even know the lunch break was only 30 minutes. Everyone here stayed and ate.

[Counselor 1]: You didn't tell us.

[Counselor 2]: Our food is being delivered right now.

The Court: Okay. You may proceed.

[Counselor 1]: You didn't tell us we would be given a 30-minute lunch, Your Honor.

The Court: You may proceed, sir.

[Counselor 1]:  Because we could have had - -

The Court:  If you want - - if you're ready to pass this witness, then - -

[Counselor 2]:  I'm not ready to pass the witness.

The Court:  Then you need to - -

[Counselor 2]:  I need to make a record.

The Court:  We'll do that on a break.

[Counselor 1]:  Let the record reflect - -

The Court:  We'll do that on a break.

[Counselor 1]: - - that everybody in the courtroom, except for the Defense, knew that we were taking a 30-minute lunch today.

[Counselor 2]: Your Honor - -

[Counselor 1]:  Let the record reflect that everyone in the courtroom was provided lunch when we had - -

The Court:  That is not correct.  I was not provided lunch.  The court staff and the jurors were provided lunch.

[Counselor 2]:  That's our argument as to why we should be able to eat our lunch.

The Court:  Okay.  If you don't have a question for this witness, then - -

[Counselor 2]:  I'm not passing the witness right now.

The Court:  Okay.  Then have a seat, and we will - - okay.  State may proceed with redirect.  State may proceed with redirect.

[Counselor 2]:  I'm not passing the witness, Your Honor.

The Court:  I'm ordering you to have a seat.

17

[Counselor 2]: I'm not passing the witness, Your Honor.

The Court: You're under this Court's order to sit down. Ask a question or the State is going to start asking.

[Counselor 2]: I'm not passing the witness. I'm not - -

The Court: Have a seat, sir.

[Counselor 2]: And now we don't get to pick our food up.

The Court: Have a seat and ask your next question.

[Counselor 2]: We don't get a minute to pick it up? You wait to tell me this, and I don't get to eat? We don't get any breaks? Are you trying to--

The Court: Have a seat, sir, and ask your next question.

[Counselor 2]: Are you trying to like - -

The Court: You're out of order, - -

(Speaking simultaneously.)

The Court: - - and you're disrupting the orderly proceeding of this court. The jury is excused.

[Counselor 1]: Wow.

[Counselor 2]: What's going on, bro? Come on. For real, bro?

(Open Court, Defendant Present, Jury Not Present:)

[Counselor 1]: That's not fair.

The Court: And he's not allowed to leave. You're not free to leave, sir.

[Counselor 2]: I'm just stepping out.

18

The Court: You're not free to leave, sir.

[Counselor 1]: Your Honor - -

[Counselor 2]: I didn't do nothing.

[Counselor 1]: Your Honor, here we are.

The Court: It's not your turn to speak, and you will be silent. You will be silent, or you will be in custody. Do you understand me?

[Counselor 1]: You are so quick to put us in custody, Your Honor. She's trying to put officers of the court into the back.

The Court: You're in contempt, and you're in custody.

The trial court then ordered defense counsel into custody. After being in custody for less than twenty seconds, they were brought back into the courtroom. The trial court admonished them on the record (without the jury present):

> The Court: . . . You have been taken into custody for your continual disruptions of the orderly proceeding of this [C]ourt. I'm going to grant you a PR bond, and we're going to have a hearing at a later date regarding this issue - - these issues, should I say.
>
> You will not continually speak out and disrupt the jury after I've stated that your time to speak is over. That is a violation of the inherent powers of this Court. It's disrespectful to this Court. It is not treating the Court with the authority and dignity that - - you may not like this Court personally, but the Court is the one that's presiding over this trial, and you will follow this Court's orders and rules and instructions.

Defense counsel continued to argue with the trial court about wanting to "perfect the record," contending that they had not disobeyed any of the trial court's orders. Counselor 2 accused the trial court of putting them in jail "like animals" and of not letting them eat lunch or giving them notice of the thirty-minute break.

19

## 2. Standard of Review and Relevant Law

Due process requires a neutral and detached hearing body or officer. *See Brumit v. State*, 206 S.W.3d 639, 645 (Tex. Crim. App. 2006). When reviewing allegations of bias, we afford trial courts broad discretion to express themselves and their opinions, including opinions that may be critical, disapproving, and even hostile toward a party or his attorney. *See Gaal v. State*, 332 S.W.3d 448, 454 (Tex. Crim. App. 2011). Accordingly, "'expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women' may display, do not establish bias or partiality." *Id.* (quoting *Liteky v. United States*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994)). Indeed, "[a] judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune." *Liteky*, 510 U.S. at 556, 114 S. Ct. at 1157. To show that an alleged bias denied a party due process, the party must demonstrate a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.*, 510 U.S. at 555, 114 S. Ct. at 1157. "Absent a clear showing of bias, the trial court's actions will be presumed to have been correct." *Brumit*, 206 S.W.3d at 645.

A trial court has broad power in overseeing trial proceedings. *Ex parte Jacobs*, 664 S.W.2d 360, 363 (Tex. Crim. App. 1984) ("The court's authority to regulate trials, and accordingly, to punish for contempt, is broad and plenary."). Indeed, the trial court is required to ensure that the proceedings be "conducted with dignity and in an

20

orderly and expeditious manner" and to "control the proceedings so that justice is done." Tex. Gov't Code Ann. § 21.001(b). Further, Texas Rule of Evidence 611(a) provides that a trial court "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth; . . . avoid wasting time; and . . . protect witnesses from harassment or undue embarrassment." Tex. R. Evid. 611(a).

### 3. Analysis

### a. Trial court rulings on objections

Coleman first argues that the trial court's bias was shown through its "pattern of overruling his objections and granting those of the State." As evidence of this pattern, he points us to a portion of trial during which both his attorneys and the State lodged about sixty objections each, with his objections being overruled forty-four times and the State's only ten times.

"'[J]udicial rulings alone almost never constitute a valid basis for a bias'" because "bias or prejudice is something more than an unfavorable ruling and must 'connote a favorable or unfavorable disposition or opinion that is somehow *wrongful or inappropriate*.'" *Casas v. State*, 524 S.W.3d 921, 924 (Tex. App.—Fort Worth 2017, no pet.) (quoting *Liteky*, 510 U.S. at 550, 114 S. Ct. at 1155). This is particularly true where the appellant does not actually challenge the legal bases of any of the trial court's rulings on his objections. *See Avilez v. State*, 333 S.W.3d 661, 674 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd). Coleman posits that the trial court's objection-

21

overruling rate shows a clear bias against him—but he has not raised a single issue on appeal related to the merits of those rulings. Rather than showing bias, this indicates that the trial court was simply acting within its discretion to issue legal rulings in the normal course of the proceedings. *See id.*

### b. Scheduling

Coleman next argues that bias was shown by the trial court's failing to notify him that the trial's fourth day would stretch later into the evening and of the thirty-minute lunch break.

First, we note that the control of the trial court's business is within the sound discretion of the trial court. *Marquez v. State*, 921 S.W.2d 217, 223 (Tex. Crim. App. 1996). This includes the scheduling of trial-court hearings and proceedings. *Cooper v. State*, 673 S.W.3d 724, 735 (Tex. App.—Fort Worth 2023, no pet.). Thus, the trial court acted within its discretion when it made these scheduling decisions.

Indeed, within any trial, the trial court is tasked with juggling the schedules of the many people involved—court staff, witnesses, jurors, attorneys, and those in the gallery. Unfortunate as it may be, scheduling inconveniences will undoubtedly arise for those involved. In this case, it seems that the trial court's scheduling may have inconvenienced Counselor 2 in his parenting duties. But we do not see that inconvenience as showing particular bias or animus toward Coleman or his counsel. And there is no indication in the record that the trial court knew prior to making the decision to stretch trial into the evening that Counselor 2 needed to pick up his child

22

by 7:00. Nor does the record show that the trial court intentionally scheduled court to extend into the evening hours for any improper purpose to prejudice Coleman's attorneys. Instead, the trial court said that it was mindful of Counselor 2's situation but was also sensitive to issues related to the timing of the trial itself. In the end, trial recessed at 6:32 that evening, and the record does not indicate whether Counselor 2 was actually affected in his childcare duties.

As to the lunch-break issue, the record establishes that the trial court twice informed defense counsel of the time that the break would end. Accordingly, Coleman's argument that he and his attorneys did not have notice of the thirty-minute lunch break is conclusively negated by the record and cannot support a showing of bias.

### c. Contempt

Next, Coleman argues that the trial court's finding his attorneys in contempt and ordering them into custody showed bias against him because everyone in the courtroom except for the defense knew about the thirty-minute lunch break. Putting aside the fact that Coleman and his attorneys were notified twice about the thirty-minute break, we see no bias exhibited by the trial court's contempt findings.

As noted above, a trial court has "broad and plenary" authority to regulate trials and to punish for contempt. *Jacobs*, 664 S.W.2d at 363. The record shows that throughout the trial—before being found in contempt—defense counsel had repeatedly argued with the trial court even after it made its rulings, disregarded orders

to sit, disregarded orders to lodge proper objections, disregarded orders to stop speaking, interrupted the trial court and opposing counsel, and called opposing counsel "baby" and "dishonest." Immediately prior to being found in contempt, defense counsel refused to sit as ordered and to proceed with examining a witness. The trial court warned them that they were disrupting the proceedings, and Counselor 2 attempted to leave the courtroom but was ordered to stay. The trial court warned that they would be placed into custody if they did not stop speaking. After they continued speaking, the trial court found them in contempt.

It is axiomatic that attorneys should zealously represent their clients' interests. Tex. Disciplinary R. Prof'l Conduct preamble ¶ 3, *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, App. A. This zeal, though, is balanced by the mandate that attorneys also must "conduct themselves with respect for the tribunal and legal system" and "eschew behavior likely to invoke proper admonishment." *Fortier v. State*, 105 S.W.3d 697, 702 n.6 (Tex. App.—Amarillo 2003, pet. ref'd) (citing *Metzger v. Sebek*, 892 S.W.2d 20, 38–39 (Tex. App.—Houston [1st Dist.] 1994, writ denied)). Throughout the proceedings, Coleman's trial counsel showed a pattern of disrespect and disregard for the trial court's orders and admonishments that culminated with their being found in contempt and taken into custody (outside of the view of the jury). The record supports that the trial court acted not with bias against Coleman in so ordering but, instead, within its own mandate and authority to ensure that the trial

24

was conducted in an "orderly and expeditious manner." Tex. Gov't Code Ann. § 21.001(b).

### d. Demeanor

Next, Coleman argues that "the trial court's demeanor and approach to [defense counsel] constituted an attack on counsel." He cites us to two places in the record purportedly showing such "attacks" but does not elaborate any further on this argument. The first alleged attack involved the trial court's again ordering defense counsel to sit and defense counsel responding "[Y]ou can't tell me to sit down. That's improper." The second alleged attack involved the trial court's ordering defense counsel not to read the rules of evidence in making objections and, again, to sit after making an objection. We see in these alleged attacks more of the same: defense counsel's objecting, receiving a ruling, being unsatisfied with the ruling, continuing to argue with the trial court, and disregarding orders of the trial court. For the reasons already stated, we see no bias against Coleman in either of these alleged attacks on his defense counsel, but, instead, we see the trial court's attempting to control the proceedings within its sound discretion.

### e. Paramedic Testimony

Finally, Coleman argues that trial-court bias was shown by its denial of defense counsel's request for a *Daubert* hearing to determine whether the paramedic was qualified to testify as a medical expert. Coleman does not argue the legal propriety of this ruling—for instance that the trial court abused its discretion in so ruling. Instead,

25

he makes only a nebulous claim that the trial court's denial of the *Daubert* hearing showed a clear bias against him.

Again, we see no bias against Coleman in the trial court's denial of a *Daubert* hearing related to the paramedic's testimony. The objected-to question asked the paramedic to describe the types of injuries that he had observed on Mandrell's body. Defense counsel believed an answer to this question would have required the paramedic to give an expert medical opinion. But defense counsel was wrong because a lay witness can testify concerning the appearance and nature of injuries based on his own perception and experience. *See* Tex. R. Evid. 701; *see, also J.C. v. State*, 892 S.W.2d 87, 89 (Tex. App.—El Paso 1995, no writ) (holding that layperson could testify about bruises he had seen on victim and how old those bruises had appeared). Thus, the trial court's denial of defense counsel's *Daubert*-hearing request was legally sound and does not support Coleman's claim of bias.

We hold that this record does not show a clear trial-court bias against Coleman and overrule his third issue.[7]

---

[7]Coleman says that *Abdygapparova v. State* supports his claim of bias, but we disagree. *See* 243 S.W.3d 191, 207 (Tex. App.—San Antonio 2007, pet. ref'd). There, our sister court held that the trial court's partiality "infected the integrity of the trial process" where the record showed "more than simple hostility" toward the defendant and where the judge engaged in ex parte written communications with a prosecutor which exhibited "a chumminess" between the two. *Id.* at 210. Those communications included conversations about material issues in the case, negative comments about the defendant, and even suggestions from the judge to the prosecutor about how to better conduct voir dire. *Id.* Our record contains no such

## D. RESPONDING TO OBJECTIONS

In his fourth issue, Coleman argues that the trial court erred by "refusing to allow [defense counsel] an opportunity to respond to objections from the State." He argues that the trial court's requirement that defense counsel levy their responses to the sustaining of State's objections at a later time and outside the presence of the jury (rather than immediately after the objection was made) violated his constitutional right to a fair trial. We disagree.

Texas Rule of Evidence 103 provides that, if a trial court rules to exclude evidence, the complaining party must inform the court of the substance of the excluded evidence "by an offer of proof, unless the substance was apparent from the context." Tex. R. Evid. 103(a)(2). It continues:

> The court may make any statement about the character or form of the evidence, the objection made, and the ruling. The court must allow a party to make an offer of proof as soon as practicable. In a jury trial, the court must allow a party to make the offer outside the jury's presence and before the court reads its charge to the jury.

Tex. R. Evid. 103(c).

The right to make an offer of proof is absolute. *See Kipp v. State*, 876 S.W.2d 330, 333 (Tex. Crim. App. 1994); *Andrade v. State*, 246 S.W. 3d 217, 226 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). A trial court does not have the option to deny such a request, although such denial is subject to a non-constitutional harm analysis.

communications or extrajudicial evidence and we, thus, do not find *Abdygapparova* instructive here.

27

*See Potier v. State*, 68 S.W.3d 657, 666 (Tex. Crim. App. 2002); *Mata v. State*, 517 S.W.3d 257, 269 (Tex. App.—Corpus-Christi-Edinburg 2017, pet. ref'd). The offer of proof may consist of a concise statement by counsel, or it may be in question-and-answer form. *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009). "The primary purpose of the offer of proof is to enable an appellate court to determine whether the exclusion was erroneous and harmful. A secondary purpose is to permit the trial judge to reconsider his ruling in light of the actual evidence." *Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009).

The record here reveals that the trial court on a few occasions refused to immediately entertain defense counsel's responses (*i.e.* their offers of proof) concerning its rulings to sustain certain of the State's objections to testimony that the defense had sought to elicit. On these occasions, the trial court instructed defense counsel that they could make their arguments as to those rulings at a later time outside the presence of the jury. Defense counsel did, several times, make such offers of proof, and we see no instances in the record where the trial court outright denied them this right.

As we have already explained, the trial court had broad discretion in how it chose to govern the trial proceedings, including how it decided to rule on objections and when and how to deal with related offers of proof. *See Jacobs*, 664 S.W.2d at 363; *see also* Tex. R. Evid. 611(a). Because this was a jury trial, Rule 103 simply required the trial court to allow those offers of proof "as soon as practicable," which, in the case of

28

a jury trial, means that they had to occur outside the presence of the jury and before the charge was read. Tex. R. Evid. 103(c). Because the trial court's rules fell explicitly within these parameters, we hold that the trial court did not err when it required the defense to make certain offers of proof outside the jury's presence rather than immediately following the objection and ruling.[8] We overrule Coleman's fourth issue.

### E. LESSER-INCLUDED OFFENSE

In his fifth issue, Coleman argues that the trial court reversibly erred by refusing to include an instruction in the jury charge for the lesser-included offense of assault with bodily injury to his aggravated assault charge. In Coleman's view, there was enough evidence (based on Dr. Ingram's testimony) for the jury to have believed that he did not drive forward with Mandrell's arm stuck in the window and that Mandrell's injuries were not caused as Mandrell had alleged. Coleman says that this evidence would have "allowed the jury to decide [that he] was guilty only of assault." We disagree because there was no affirmative evidence that any assault occurred apart from an assault in which Coleman's vehicle was used as a deadly weapon.

We use a two-step analysis to determine if a defendant was entitled to a lesser-included-offense instruction. *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007). First, the lesser offense must come within article 37.09 of the Texas Code of Criminal Procedure. Tex. Code Crim. Proc. Ann. art. 37.09 (providing four

---

[8]We also note that Coleman has not complained on appeal that any of the trial court's specific rulings sustaining the State's objections were actually erroneous. Thus, even if we had found error on this issue, it likely would have been harmless.

instances in which an offense constitutes a lesser-included); *Moore v. State*, 969 S.W.2d 4, 8 (Tex. Crim. App. 1998). The parties here do not dispute that the first step is satisfied in this case.

Second, some evidence must exist in the record that would permit a rational jury to find that, if the defendant is guilty, he is guilty of the lesser offense only. *Hall*, 225 S.W.3d at 536; *Ponce v. State*, No. 02-16-00132-CR, 2017 WL 1352101, at *3 (Tex. App.—Fort Worth Apr. 13, 2017, pet. ref'd) (mem. op., not designated for publication). The evidence must be evaluated in light of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the defendant of the greater offense while convicting him of the lesser-included offense. *Id.*; *Ponce*, 2017 WL 1352101, at *3. The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Moore*, 969 S.W.2d at 8. Put differently, anything more than a scintilla of evidence may suffice to entitle a defendant to a lesser-included-offense instruction. *Hall*, 225 S.W.3d at 536. But "[i]t is not enough that the jury disbelieves evidence pertaining to the greater offense; there must be some evidence directly germane to the lesser-included offense for the finder of fact to consider before an instruction on a lesser-included offense is warranted." *Dobbins v. State*, 228 S.W.3d 761, 768 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) (citing *Hampton v. State*, 109 S.W.3d 437, 440 (Tex. Crim. App 2003)).

The crux of Coleman's issue requires us to review whether his use of a car fits the definition of a deadly weapon. A deadly weapon includes "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." Tex. Penal Code Ann. § 1.07(a)(17)(B). It is not required that the defendant actually intended death or serious bodily injury, only that the defendant intended to use an object such that it would be capable of causing death or serious bodily injury. *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000); *see Ponce*, 2017 WL 1352101, at *3 (applying deadly-weapon definition to car). "To decide if a car is a deadly weapon in a particular case, we evaluate the manner in which the defendant used the car during the felony, and then we consider whether the car was capable of causing death or serious bodily injury during the felony." *Ponce*, 2017 WL 1352101, at *4 (citing *Sierra v. State*, 280 S.W.3d 250, 255 (Tex. Crim. App. 2009)).

Coleman argues that Dr. Ingram's testimony provided evidence that he did not drive with Mandrell's arm pinned in the window and did not run over her with his car. In other words, he argues that this evidence constitutes at least a scintilla of evidence that he did not drive the car in a manner capable of causing death or serious injury. We disagree.

The only first-hand evidence of the incident came by way of Mandrell's testimony. She testified that she put her arm into Coleman's car, he rolled the window up, her arm was pinned inside the car, Coleman accelerated quickly forward and dragged her for a short time, and then she fell to the ground and was run over by

31

the car. Nothing that Dr. Ingram testified to refuted the fact that Mandrell put her arm into Coleman's car, that he rolled the window up and sped away, and that this knocked Mandrell to the ground where she received serious road rash.

We hold that a car used in this manner is capable of causing death or serious bodily injury. *See id*; *Dobbins*, 228 S.W.3d at 768 (collecting cases of cars held to be used as deadly weapons and noting that, though slow-moving cars might produce less-severe injuries, they are undoubtedly capable of causing death or serious bodily injury). Because there is no affirmative evidence in the record that Coleman committed an assault other than one in which he used a deadly weapon, we also hold that the trial court did not abuse its discretion in refusing to submit the lesser-included-offense instruction to the jury. *See Dobbins*, 228 S.W.3d at 769. Put differently, Coleman was not entitled to the instruction because the jury could not have found from the evidence that Coleman assaulted Mandrell in any way other than while he used his car as a deadly weapon. *See id.* at 769–70 ("Because there is no affirmative evidence in the record that would have permitted a rational jury to find that appellant was guilty only of simple assault, the trial court did not abuse its discretion in refusing to submit the lesser[-]included offense."). For these reasons, we overrule Coleman's fifth issue.

## III.  CONCLUSION

Having overruled all of Coleman's issues, we affirm the trial court's judgment.

/s/Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 11, 2024